WILLIAM C. GATELY v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—56 S. W. (2d) 54.

Division Two, December 31, 1932.*

*NOTE: Opinion filed at April Term, 1932, September 28, 1932; motion for rehearing filed; motion overruled at October Term, December 31, 1932.

2

*E. T. Miller* and *Phil M. Donnelly* for appellant.

4

*Neale, Newman & Turner* and *Haymes & Dickey* for respondent.

COOLEY, C.—Action for personal injury under the Federal Employers' Liability Act. From verdict and judgment for plaintiff in the sum of $20,000 defendant appeals. It is conceded that at the time of plaintiff's alleged injury he and the defendant were engaged in interstate commerce and that the suit was properly brought under the above mentioned act. No question arises as to the sufficiency of the pleadings. Defendant's answer, in addition to a general denial, was a plea that plaintiff assumed the risk. Plaintiff's evidence tended to show the following:

At the time of his injury he was and for several years had been in defendant's employ as a boiler washer in its shops at Springfield, Missouri. Previously he had worked for defendant about its shops in other capacities. In order to wash the boiler of an engine certain plugs must be unscrewed and taken out, "pulled," in the vernacular of the engine men. Some of the plugs are so situated as to be difficult to get at and some are very hard to pull. In removing plugs such as the one here involved the workmen use a barrel wrench, a bull wrench and a steel bar, the latter being used as a handle or lever with which to turn the wrench. The barrel wrench is a short cylinder shaped at the end to fit over the head of the plug. The bull wrench is a four-sided piece of steel shaped at the ends to fit over the head of a plug and also to fit into the barrel wrench when necessary to use both in order to give greater length to reach some of the less easily accessible plugs. There are holes through the body parts of the wrenches through which is inserted the end of the steel bar which thus furnishes a handle and affords leverage by which to turn the wrench. The steel

bars are of different lengths for use on plugs differently located. At the time of his injury plaintiff was attempting to pull a plug in one of defendant's large engines, using a barrel wrench placed on the plug, a bull wrench fitted into the barrel wrench and a steel bar about four and a half feet long inserted through one of the holes in the bull wrench. The bar was seven-eighths of an inch in diameter except near the end where it tapered to about nine-sixteenths of an inch in diameter to fit the hole and was slightly bent for a distance of four or five inches back from the smaller end. The bar had been furnished him by defendant for the use to which he was putting it and the wrenches and bar so used were the appropriate tools customarily used for the work he was doing. While pulling on the bar plaintiff was in a stooped position and was pulling very hard, the plug being difficult to start, when the bar suddenly broke and plaintiff was "jerked violently upward and backward," injuring his back and sacroiliac joint.

The bar in question had been furnished to plaintiff by defendant some six months previously. The bar had become bent too much at the crook near the small end, because of which it would sometimes slip out of the hole in the wrench, making it unsafe to use. Two days before his injury plaintiff had taken it to a blacksmith employed by defendant to have it reshaped so as to be safely usable. He and all other boiler washers had been instructed to take their tools, including bars such as this, to said blacksmith for any needed repairs and not to attempt to repair the tools themselves. There was evidence from both parties that such were defendant's instructions to the employees, that it would have been a violation of defendant's rules for plaintiff to have repaired the bar himself, and that the blacksmith to whom he said he took it was the employee of defendant to whom the boiler washers had been instructed to go for such repairs.

Plaintiff testified that the blacksmith heated the bar red hot, beat it into shape, threw it into a tub of cold water to cool and returned it to him; that he did not himself know the proper way to reshape or to temper such a bar. He further testified that it broke at the place where the blacksmith had heated, shaped and tempered it. It was shown by qualified witnesses for plaintiff and in fact conceded by defendant's blacksmith that to reshape and temper the bar in the way plaintiff testified was done was improper; that it would make the bar brittle and easy to break instead of tough and strong as it should be and would be if tempered in the proper way, which was described but which need not here be detailed.

The blacksmith, testifying for defendant, denied having shaped and tempered the bar for plaintiff on the occasion in question. Also, defendant introduced testimony by several witnesses, which plaintiff denied, tending to show that shortly before the date of his alleged injury and several times theretofore plaintiff himself had heated, shaped and tempered a steel bar like the one in question and such

as was used by the boiler washers in pulling plugs, and had done it in the way he testified the blacksmith used on this occasion. Further facts can best be given in connection with the legal questions to which they relate.

██ ██ Defendant contends that its demurrer to the evidence should have been sustained on the ground that it conclusively appears that plaintiff assumed the risk. Under plaintiff's evidence the risk was not an ordinary risk of plaintiff's employment but one arising from negligence attributable to the employer. Appellant does not contend that it would not be responsible for the negligence, if any, of its blacksmith in repairing and tempering the bar, hence we need not further discuss that question. Such extraordinary risk is assumed by the servant only when known to and appreciated by him or so obvious that he must be presumed to know it. [Oglesby v. St. L.-S. F. Ry. Co., 318 Mo. 79, 1 S. W. (2d) 172; McIntyre v. St. L. & S. F. Ry. Co., 286 Mo. 234, 256 et seq., 227 S. W. 1047, 1054 and cases cited; State ex rel. St. L.-S. F. Ry. Co. v. Cox, 329 Mo. 292, 46 S. W. (2d) 849 and cases cited.] And the burden is upon the defendant alleging assumption of risk to show that the servant knew or should have known of the negligence complained of and knew and appreciated or should have known and appreciated the increased danger. [Oglesby v. St. L.-S. F. Ry. Co., supra; State ex rel. v. Cox, supra.] The defect in the tool in this case was not one that was observable. ██ There was no evidence that the appearance of the bar indicated whether or not it was properly tempered to bear the strain it was designed to bear without breaking. Plaintiff testified he saw the blacksmith shape and temper it but that he did not know how such steel bars should be treated and tempered to fit them for the use to which they were to be put. His evidence did not show nor was there any evidence conclusively showing that he knew or should have known that the bar, heated, shaped and tempered as he said the blacksmith did it, would be thereby rendered brittle and liable to break. He had used it for six months or so, sometimes subjecting it to greater strain than on this occasion and it had not broken. His evidence tended to show that sometimes two or even three men would have to pull on one of those bars, used in the way this one was being used when it broke, in order to loosen a plug. Some of defendant's witnesses testified that at times two men were required thus to pull on it. Clearly the court could not say as a matter of law that plaintiff knew or should have known the defective condition of the bar and knew or should have known and appreciated the danger of using it as he did after defendant's blacksmith had repaired it.

Appellant cites also on this point cases holding that the master is not liable for injury to the servant caused by straining and overexerting himself in lifting heavy objects and the like. Such cases are not in point. Plaintiff was not injured in that way. He was doing

his work in the customary manner, using the bar as it was designed to be used, and it was not strain or over-exertion in pulling upon it that injured him but the unexpected breaking of the bar due to its improper tempering.

Neither does the simple tool doctrine invoked by appellant apply to the facts of this case. The tool in question was simple enough but the defect in it was not observable or discoverable by inspection such as a workman using it could reasonably be expected to make, even were he charged with the duty of making such inspection. In order to know that it was so defective plaintiff must have had a knowledge of the properties of steel and the process of tempering it which his evidence tends to show he did not have and which he was not required to possess, as shown by the fact that defendant's rules forbade his making such repairs and required him to take the tool to the blacksmith who should have had, and according to his own testimony did have, the necessary knowledge and skill. The latter testified in effect that to heat, shape and temper the bar in the manner plaintiff testified was done would make it brittle and likely to break. We think it clear that the demurrer to the evidence was properly overruled so far as concerns the issue of assumption of risk. That issue was submitted to the jury on instructions requested by defendant and decided against defendant.

Appellant further contends that its demurrer at the close of the evidence should have been sustained because:

"From the record the evidence shows overwhelmingly that plaintiff (1) did not receive an injury; (2) that he was not injured in the manner in which he claims; (3) that the bar with which he claimed to be working was not straightened or reshaped by the blacksmith; (4) that if the bar was straightened or reshaped that plaintiff did the work himself at one of the babbitt furnaces; (5) that if plaintiff had anything the matter with him physically that it was something caused or brought about by sickness and not from an injury; that the documentary evidence shows that plaintiff did not receive an injury, but that he claimed over his own signature in his reports to the insurance companies that his condition was rheumatism and disease of the kidneys."

This contention will require a further statement of the facts. We have already sufficiently indicated the nature of the evidence pro and con on the question of whether or not the blacksmith repaired the bar. The evidence was conflicting and while plaintiff's testimony was in effect contradicted by several witnesses that question was clearly for the jury which determined it against the defendant. Nothing further need be said of subdivisions 3 and 4 above quoted.

Relative to the fact, the nature and the extent of plaintiff's alleged injury the evidence was voluminous and conflicting. For the point under consideration a brief summary will suffice. Plaintiff

claimed that when the bar broke he was thrown violently backward, receiving a severe wrench and shock; that he suffered great pain in his hip and back, became weak, sick and for some minutes blind and broke out in sweat; that he crawled upon the engineer's seat where he had to remain fifteen or twenty minutes. He remained on duty the rest of that day (Sunday, April 24, 1927) and Monday and Tuesday following, though suffering and unable to use the bar or do any lifting, being able only to hold the wrench while his helper loosened the plugs. On Wednesday morning he reported for duty but within thirty minutes thereafter, feeling sick and in too much pain to work, asked and obtained from his foreman, Bergstrom, leave to "lay off" and was given an order to go to the "Frisco" Hospital. He claimed he informed Bergstrom that the bar had broken and he had received an injury to his back, also that on Monday he told "several of the boys" he was hurt and on Tuesday told Brandt, the roundhouse foreman, that he had hurt his back; that on going to the hospital he informed the physicians in charge that he had received an injury but that they did not examine his back except perhaps in a cursory way. He was sent by one of the doctors employed by defendant at the hospital to another Frisco doctor, a tonsil specialist, for examination of his tonsils, which were found to be without disease or infection. He was taken to a dentist who pulled eight or ten of his teeth and later pulled the rest. It appears the doctors at the hospital thought he was suffering from rheumatism and that it might have been caused by infection from bad teeth or tonsils. It may be stated here that it is practically conceded that no trouble with his tonsils was discovered and the removal of plaintiff's teeth brought about no improvement in his condition.

On June 19 plaintiff consulted Dr. Cowden who examined him and under whose care he remained thereafter. Later, about August, he went twice, at defendant's suggestion, to defendant's hospital in St. Louis where X-ray pictures were taken. These were introduced at the trial. Dr. Cowden testified that he examined plaintiff and found an injury to the left sacroiliac joint; that the joint had slipped loose a little and was slightly separated for a distance of an inch or an inch and a half. Medical witnesses offered by plaintiff testified in effect that the X-ray pictures indicated, in their judgment, a slight separation of the sacroiliac joint and that such condition could be caused by an injury received in the manner in which plaintiff claimed to have been injured.

Plaintiff's evidence, his own testimony and that of others who had known and observed him was that prior to the time he claims to have been hurt he was a healthy, strong, able-bodied man and could do any kind of manual labor. After that time he showed strong indications of severe disability. Doctors who examined him found soreness and tenderness in the lower lumbar region and in the region of the left

sacroiliac joint. There was expert testimony that an injury to the sacroiliac joint or to the fifth lumbar vertebra could cause such soreness.

On behalf of defendant a considerably larger array of expert witnesses testified in substance and effect that in their opinion plaintiff did not have an injury to the sacroiliac joint, that such an injury as he claimed to have could not have been caused in the way he said he received it and could not have been detected if it existed by a physical examination such as Dr. Cowden testified to and that the X-ray pictures did not show such condition. The doctors at the Frisco Hospital, whom plaintiff said he told he had been injured, testified that he did not so inform them; that he complained of feeling sick, of pain and soreness in his back and that they examined his back and concluded his trouble was rheumatism due probably to infection. Bergstrom and Brandt denied that plaintiff had informed them he had been injured. Bergstrom said that when plaintiff asked to be excused from work he complained only of being sick. Brandt and several other employees of defendant testified they had talked with plaintiff about the time he quit work and that he spoke of being sick but said nothing of having been injured. One testified that plaintiff told him he had not been injured.

Lawrence Patton, who was plaintiff's helper when the bar broke, was called by defendant. He contradicted plaintiff's testimony that the latter became sick and crawled up on the engineer's seat to rest, also testifying that plaintiff continued pulling plugs and said nothing about having been injured.

The documentary evidence upon which appellant largely relies to destroy plaintiff's *prima facie* case (if, as appellant says, he made a *prima facie* case) consisted of certain reports made by plaintiff to insurance companies in which he carried disability insurance. In 1926, about a year before this accident, plaintiff had received an injury to the upper part of his back. [Note. Plaintiff's evidence tended to show that he had entirely recovered from that injury prior to April, 1927, and that it had left no ill effects.] Following that injury he had "laid off" from work about seventy-five days. His physician thought he had rheumatism and perhaps some temporary kidney trouble, there being soreness about the kidneys, and so advised him. During that interval he made certain reports to his insurance companies for the purpose of collecting insurance, in which he stated that he was suffering from rheumatism and diseased kidneys and that his illness was not due to accident. However, following those reports, plaintiff wrote to one of those companies, the Benefit Association of Railway Employees, the following explanatory letter:

"Dear Sirs: Yours today rec'd, and in regard to my statement in claim blank concerning kidney trouble, in Dr.'s examination for kidney trouble he finds them good, but soreness around kidneys and

muscles of back, due he thinks to a strain from accident some four months ago. My foot slipped off a bar while pulling on wrench, throwing me against a valve on a locomotive cilinder. Other than this I do not know. Dr. W. H. Cowden, 200 E Commercial St has been my family physician the past ten years and I have known him all my life, being my fathers physician before me.

"This is my first experience of this kind being stout man. Never suffered with this kind of trouble before."

In his testimony he explained that in making those reports he thought rheumatic pains would be considered sickness regardless of how they started and that he thought the insurance companies wanted to know his condition at the time claim was made rather than the origin of his trouble. Dr. Cowden testified that at that time plaintiff had pains of a rheumatic nature and some disturbance but no chronic disease of the kidneys.

Relative to the injury here in question, on May 1, 1927, plaintiff made claim for compensation to the Metropolitan Life Insurance Company, in which he stated in answer to a question that his disability was caused by "rheumatism in back and limbs," and that his physician was Dr. Sewell, one of the Frisco Hospital doctors then treating him, who attached a certificate that he was treating plaintiff for "acute rheumatism" and that the latter was "totally unable to perform his duties." On May 29, 1927, plaintiff made a similar claim to the Benefit Association of Railway Employees, giving his illness as rheumatism and his physician as Dr. Powell, the Frisco Hospital physician then treating him, and stating further that he had the disease "some, a year ago." Dr. Powell attached a certificate that plaintiff's trouble was rheumatism, incapacitating him from work, not chronic. A postal card dated May 1, 1927, also sent by plaintiff to the Benefit Association was introduced, in which plaintiff stated that his disability was due to illness, not to accident, and named Dr. Powell as his doctor.

As to reports made in 1926, plaintiff made them in accordance with the advice of his physician who thought he had rheumatism and might have some kidney trouble. Of the latter it may be said that in this trial, while some of defendant's expert witnesses testified that the X-ray pictures showed an apparent enlargement of one kidney, other doctors called by defendant had examined plaintiff's urine and found no indication of kidney disease. Plaintiff's evidence tended to show that he had entirely recovered from whatever ailed him in 1926. Claims made to insurance companies in May, 1927, were made before he had consulted or been examined by Dr. Cowden and while he was under the care of the Frisco Hospital physicians. He explained that he made those statements as to the cause of his disability because of and relying upon the information given him by the doctors who were then treating him.

■ Appellant in its brief argues that though it be held plaintiff made a *prima facie* case that does not entitle him to go to the jury "where the *prima facie* case is so discredited and destroyed as to put that presumption to flight," and that the court should direct a verdict for the defendant when the plaintiff's *prima facie* case is completely overcome and destroyed by unimpeached and uncontradicted documentary evidence, as appellant contends is the case here. Appellant cites Kazee v. Kansas City L. Ins. Co. (Mo. App.), 217 S. W. 339; Guthrie v. Holmes, 272 Mo. 215, 195 S. W. 854; Yarber v. Conn. Fire Ins. Co. (Mo. App.), 10 S. W. (2d) 957; Darlington Lumber Co. v. Mo. Pac. Ry. Co., 243 Mo. 244, 245, 147 S. W. 1052; and like cases.

Without taking space to analyze the cases cited it is sufficient to say that they are based upon facts essentially different from those of the instant case and the rule they announce cannot be applied to the facts of this case. Plaintiff's case does not, as appellant seems to argue, rest upon or require the aid of a presumption which, it is held in some of the cases cited, takes flight when evidence on the point comes into the case. It is supported in all essential ingredients by direct and positive testimony. Nor can it be said as a matter of law that the "documentary evidence" relied on to destroy it is so uncontradicted and unimpeached as to have that effect. It is true plaintiff after his injury reported to the insurance companies that his trouble was rheumatism and in one report that it was not due to accident but to illness. But that was while he was under the care of doctors who so advised him notwithstanding the information which he testified he gave them that he had received an injury. And it was before he had been examined by Dr. Cowden from whom, as he contends, he first learned the real nature of his ailment. Obviously that evidence, together with all the rest of defendant's evidence tending to contradict that of plaintiff, presents only a question of the credibility and weight of conflicting evidence, a jury question which the court could not decide on demurrer.

Neither can we allow appellant's further contention that the verdict is so opposed to the physical facts and "all reasonable probabilities" and to the overwhelming weight of the evidence as to be manifestly the result of mistake, passion or prejudice, and that the court should have sustained the demurrer for that reason. "It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked-for results attend the meeting of interlacing forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [Schupback v. Meshevsky (Mo.), 300 S. W. 465, 467, quoting from 10 R. C. L. 1008, 1009.] See, also, Shaw v. Amer. Ins. Union, 33 S.

W. (2d) 1052, for discussion of rule that documentary evidence, in order to overcome a *prima facie* case must be undisputed and unimpeached.

■ In this connection appellant makes another contention, viz., that Section 1003, Revised Statutes 1929, which precludes the trial court from granting more than one new trial, except on certain grounds stated, is unconstitutional. That contention was not made at any stage of the proceedings in the trial court, appearing for the first time in appellant's brief here. There had been a previous trial of this cause in which plaintiff recovered a verdict for $5,000, which the trial court set aside on the ground that it was against the weight of the evidence. The same ground was urged, among others, in the motion for new trial following the second trial. We are not advised by the record whether or not plaintiff made a stronger case on the second trial, following which the court overruled defendant's motion for new trial. There is nothing in the record from which we can determine whether or not the trial court would have sustained the motion, absent the mandate of Section 1003, on the ground that the verdict is against the weight of the evidence, hence appellant's constitutional point could be of no avail if, under the circumstances, it should be deemed timely presented and should be sustained, a question we need not consider. The demurrer to the evidence was properly overruled.

■ Complaint is made of certain rulings in the admission and rejection of evidence. Over defendant's objection plaintiff was permitted to state on direct examination how he was hurt in 1926. That evidence was competent because that injury and the effects thereof had a bearing upon the sharply contested issue of whether or not plaintiff's physical condition at the time of the trial was the result of the injury for which he sued. Defendant itself many times adverted to that injury during the trial.

■ Plaintiff was asked why, if he was suffering, he went back to work on Monday and Tuesday following his injury, to which he replied: "Well, financially, I needed to be there." Defendant made no objection until the question had been answered when it objected and moved to strike out the answer on the ground that "it was not a proper reason" and "was not proper evidence." It does not appear that defendant did not have time and opportunity to object before the question was answered. The objection, even if sufficient, which we doubt, came too late.

■ Plaintiff was asked what Mr. Harvey, an officer and master mechanic of defendant company, told him when he sent him to the Frisco Hospital at St. Louis. Objection was made on the ground that what Harvey said was not binding on defendant and would not tend to prove or disprove how plaintiff was injured or the nature or extent of his injuries if any. In substance Harvey merely asked plaintiff

why he had quit the hospital at Springfield and if he would go to the hospital at St. Louis, and offered to furnish him a pass and see that it cost him nothing at the St. Louis hospital. It was not disputed that plaintiff was given a pass to St. Louis and that no charge was made for the examination given him there. There was no disputed issue on that point. Whether competent or not what Harvey said could not have been prejudicial to defendant. There was no objection to what plaintiff himself said in that connection.

A witness, Price, was asked to describe plaintiff's condition after April, 1927, and said that plaintiff was sitting around home, that he was "complaining most of the time—he didn't seem to be able to do anything; he always told me he wasn't - - ." Defendant objected to the answer and moved to strike it out on the ground that "the way plaintiff seemed" was a conclusion of the witness and that what plaintiff said was not binding on defendant. The objection was overruled but later Price's testimony as to what plaintiff told him was withdrawn by plaintiff's counsel and the court directed the jury to disregard it. As to the testimony that plaintiff did not seem to be able to do anything, it amounted to no more than that it appeared to the witness, who knew plaintiff well and had seen him frequently before and after the accident, that he was not able to work. We think there was no prejudicial error in that incident.

The following question was propounded to plaintiff's witness, Dr. Freeman:

"Q. If a man was working on a locomotive, pulling plugs out of the boiler, using a wrench similar to the one which I hold in my hand, and was exerting great force pulling up on the bar; another man holding the wrench; and the man was in a bent position as he was pulling up, something like I am at the present time, and he was pulling hard on that steel bar, and it should suddenly break and snap in two, and he should be thrown backwards, taking two steps and falling against the engineer's seat in the locomotive, and if immediately afterwards he was rendered sick and blind and remained in that condition for some fifteen or twenty minutes; and if after that accident he was unable to lift or to pull on the bar or to do any heavy work and has been unable to do so from that time until this, almost nineteen months; taking those facts into consideration, with the fact that prior to that time, outside of an injury which caused some pain in the upper part of his back, or in his back, we will say, he had always been in good health; would you saw (say) that this sore spot, which has existed from that time until now in the region of his lumbar vertabrae, was caused by what?"

Defendant objected on the grounds that there was no testimony that the sore spot had existed since the time stated, that the question did not include Dr. Cowden's testimony that the sacroiliac joint had slipped an inch to an inch and a half and the soreness was at that

point, and that the question should include all the facts in evidence. Plaintiff thereupon amended the question to include Dr. Cowden's testimony relative to separation of the joint. There was no further objection and the witness answered: "An injury."

Appellant complains of that question especially because later the court sustained plaintiff's objection to the following question put by it to Dr. Freeman on cross-examination: "If there had been a separation (of the sacroiliac joint) of an inch to an inch and a half you could have found that with your hand?" Plaintiff objected because there was no testimony of such a separation. Dr. Freeman had testified that when he examined plaintiff he could not feel the separation. The only testimony in the case at that time that there was a separation was that of Dr. Cowden. A careful examination of Dr. Cowden's testimony shows that he did not mean and did not testify that there was a separation of that distance laterally, that is so that the bones meeting in that joint were an inch to an inch and a half apart. His testimony clearly was intended to and did mean that there was a slight separation extending for that distance along the joint. The hypothetical question as amended conveyed that idea. The court did not err in permitting the witness to answer it. Nor was there error in sustaining the objection to defendant's subsequent question. It assumed facts not in evidence and opposed to the evidence upon which it purported to be based. Moreover, defendant later obtained from Dr. Freeman the evidence sought by that question. He testified in his cross-examination that he could easily have discovered a lateral separation of an inch to an inch and a half.

A hypothetical question to plaintiff's witness, Dr. Feller, was objected to because not including Dr. Cowden's testimony "with reference to the sacroiliac joint pulling apart an inch to an inch and a half." The objection was properly overruled because, as we have stated, Dr. Cowden had not so testified and further that part of the question was hypothecated upon the showing made by the X-ray pictures which the witness had examined.

There are some other complaints of the admission of evidence which we find without merit and deem it unnecessary to mention specifically. Appellant also complains of the action of the court in sustaining objections to several questions put by it to witnesses, other than the question to Dr. Freeman above quoted. Of these it is sufficient to say that no offer of proof was made following the rulings complained of and so far as we can judge from the questions themselves the testimony sought to be elicited would have had no material bearing on any issue in the case.

Appellant makes several objections to plaintiff's principal instruction, No. 1. The first objection is that it submits this question: "And if you find that at said time and place the defendant (plaintiff)

used said bar in the usual and customary manner and exerted thereon the usual and customary strength which it was intended to bear . . ." Appellant argues that there was no evidence upon which to base that part of the instruction and that an instruction should not be broader than the facts proved. Conceding the legal proposition that the instructions should not submit issues of fact unsupported by evidence, we disallow this contention. There was ample evidence to justify that part of the instruction.

Objection is made to the part requiring the jury to find that the blacksmith in reshaping the bar "carelessly and negligently heated and cooled said bar in an improper way and improperly tempered said bar and that as a result thereof, the said bar was too hard and brittle for the purpose to which plaintiff was instructed to and did put it, if you find he was so instructed and did so use it," etc. Two criticisms are offered to this part of the instruction. The first is that the instruction does not define what is "an improper way" to temper the bar and how it was "improperly tempered." Appellant cites no authority on this particular point. The instruction required the jury to find not only that the bar had been heated and cooled in an improper way and improperly tempered but that as a result thereof it was too hard and brittle for the use to which it was to be put. The instruction submitted the negligence charged in substantially the language of the petition. Essentially the negligence charged in both was that the bar was negligently so treated and tempered as to be made too hard and brittle. The only improper way of heating and cooling the bar and the only improper method of tempering it of which there was any evidence was that testified to by plaintiff. Defendant contended that its blacksmith did not repair or temper the bar. It was conceded that if the tempering was done in the way plaintiff described it was done in an improper way and that the bar would thereby be made brittle. The contested question on that issue was whether or not the blacksmith had repaired and tempered the bar at all. Under these circumstances if it be conceded that this part of the instruction was too general yet it could not have misled the jury or injured the defendant.

In Riley v. City of Independence, 258 Mo. 671, 167 S. W. 1022, it was contended that an instruction for the plaintiff was too general under the pleadings. This court, conceding that the instruction was subject to that criticism, held it nonprejudicial because:

"The jury could not have been misled by the general terms of the instruction, because the proof in the case covered only the specific matters complained of in the petition. Had the proof gone beyond the specific matters mentioned in the petition we would have had a different proposition entirely. But here the proof was confined strictly to the negligent acts charged in the petition, and the jury therefore had before it no other negligent act to consider. Under

these circumstances we do not think that this instruction was misleading or in any wise injurious to the defendant. Error without injury is not reversible error." [258 Mo. l. c. 684.] [See, also, Morris v. Union Depot Bridge & Terminal Railroad Co., 320 Mo. 371, 8 S. W. (2d) 11, 14; Murphy v. Duerbeck et al. (Mo.), 19 S. W. (2d) 1040, 1043.]

It has been held that it is not reversible error for the court to omit submitting in an instruction facts which it is manifest from the manner in which the case is tried are not real disputed questions in the controversy. [St. L. House Furn. Co. v. Stoecker, etc., Co. (Mo. App.), 238 S. W. 841, 843; Davidson v. St. L. Transit Co., 211 Mo. 320, 356 et seq., 109 S. W. 583; Montgomery v. Hammond Packing Co. (Mo. App.), 217 S. W. 867, 868 and cases cited.]

The second criticism of the part of the instruction now under consideration is that it submitted an issue pleaded but not proved, there being no evidence that plaintiff told the blacksmith "what the bar was used for or to be used for." There is no merit in this criticism. The petition did not allege that plaintiff so informed the blacksmith. It properly pleaded defendant's knowledge and duty to know. The evidence on both sides, including the testimony of the blacksmith himself, showed clearly and without dispute that he knew without being told the use for which the bar was designed and to which it was to be put by plaintiff.

Complaint is made that the instruction permitted the jury to find that "plaintiff was injured by having his back sprained and wrenched," etc., detailing further the injuries pleaded and proved. Appellant says there was no evidence that plaintiff's back was sprained or wrenched. Plaintiff and his witnesses may not have used those exact words as used in the petition and in the instruction but in our opinion the evidence justified submitting that element of injury. It was pleaded and we think sufficiently supported by the evidence.

It is contended that the instruction is erroneous because it purports to cover the case and authorize a verdict for plaintiff on a finding by the jury of the affirmative facts necessary for recovery but omits mention of defendant's defense that plaintiff's condition was due to rheumatism caused by infection. That defense was not specifically referred to in defendant's instructions. Appellant states its contention by quoting from State ex rel. North British & Mer. Ins. Co. v. Cox, 307 Mo. 194, 270 S. W. 113, 114, as follows:

"Where an instruction on behalf of the plaintiff authorizes a verdict on a finding by a jury of all the affirmative facts necessary for recovery, omitting mention of defense pleaded by the defendant, such instruction is erroneous, but it is always cured where such matters of defense are presented in an instruction given on behalf of the defendant."

The alleged fact that plaintiff's condition was due to rheumatism was not pleaded by defendant as a defense nor in any wise referred to in its answer. The only defense pleaded was a general denial and assumption of risk. That plaintiff's condition was due to rheumatism and not to injury received through the charged negligence of defendant did not need to be pleaded by defendant. It was not an affirmative defense but was admissible under a general denial as any other evidence tending to disprove the affirmative allegations upon proof of which plaintiff's right to recover depended. In the above quoted excerpt from 270 S. W. l. c. 114, the court was speaking of the omission from plaintiff's instruction of a defense "pleaded by the defendant." That could mean only a defense in the nature of an affirmative defense which to be provable had to be pleaded, not facts, admissible under a general denial, which tended to disprove or deny the existence of the facts upon which the plaintiff's cause of action depended. If an instruction for plaintiff covering the case and requiring a finding of every fact necessary to make out his case had to refer specifically to every fact supported by the defendant's evidence which tended to disprove the facts the jury was required to find in plaintiff's favor it would, to say the least, be tautological and might in many cases be so long and involved as to be confusing rather than enlightening.

In this case the instruction complained of required the finding of all facts necessary to make out plaintiff's case including the facts constituting defendant's negligence and that as a result plaintiff was injured, and directed that if the jury so found the verdict should be for the plaintiff. By another instruction the jury was told that if it found for the plaintiff it should in assessing his damages consider the suffering, etc., sustained by him "as a direct and proximate result of said injuries, if any." While it did not specifically refer to defendant's contention that plaintiff's condition was due to rheumatism or to other defensive contentions supported by defendant's evidence, it did not exclude such defenses. The jury could not have found the facts it was required to find in order to give plaintiff the verdict without finding against defendant on the facts asserted by the latter in negation of those asserted by plaintiff. We rule the point against appellant.

Appellant argues that the verdict is excessive but that point is urged here practically altogether on the ground that the great weight of the evidence shows plaintiff did not receive any injury and therefore any verdict for him would be excessive, a contention which we have already sufficiently answered. Plaintiff's evidence shows that at the time of his injury he was thirty-eight years of age, earning $125 to $130 per month and in line for promotion. He was a healthy, able-bodied man and except for occasional temporary illness and the temporary disability in 1926, from which he

had fully recovered, had always enjoyed good health and been able to do any manual labor. He is not educated or skilled to earn money otherwise. According to his evidence his injuries are permanent and permanently disqualify him from manual labor and have left him practically unable to do any work that cannot be done sitting in a chair. He testified that he suffered severely at the time of his injury and had suffered constantly thereafter up to the time of the trial, over eighteen months later, and was still suffering; that he cannot lie long at a time in bed but must get up and sit in a chair for two or three hours at night. He is very nervous. Dr. Cowden testified that plaintiff is still suffering and will contiue to suffer pain; that the condition of the sacroiliac joint is permanent, cannot be rectified and "will pain him fearfully when he is trying to get around and a great deal anyway," and that plaintiff cannot walk "to do any good."

In view of the ground on which this contention is urged we shall not further detail the effects of plaintiff's injuries as shown by his evidence. The question of whether or not plaintiff was injured was a jury question. Two juries have found that he was. The trial court declined to reduce the amount awarded by the jury. In view of the nature and extent of plaintiff's injuries as shown by the evidence in his favor we do not feel justified in doing so. We find no reversible error in the record and the judgment of the circuit court is accordingly affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All of the judges concur.