John H. Parrent v. Mobile and Ohio Railroad Company, a Corporation, Appellant.—70 S. W. (2d) 1068.

Division One, April 19, 1934.

*Rufus Creekmore* and *Roberts P. Elam* for appellant; *Carl Fox* of counsel.

*Eagleton, Henwood & Waechter* for respondent.

FERGUSON, C.—The plaintiff, an employee of the defendant railroad company was injured while engaged, on the night of October 6, 1929, as a remember of a "wrecking crew" in rerailing a freight car in one of defendant's freight trains, which car had derailed near High Rock, Illinois. The derailment occurred on "defendant's main line" and the work of rerailing the freight car was for the purpose of facilitating and enabling the movement of the train of which said car was a part and which train carried interstate shipments of freight and also to clear the main line track in order that the movement of defendant's interstate trains over that track might not be delayed or impeded. This action for damages for the injuries sustained was brought under the Federal Employers' Liability Act and the verdict and judgment was for plaintiff in the sum of ten thousand dollars from which judgment defendant brings this appeal.

At the point of derailment the railroad track ran north and south. The freight train was northbound. The derailed car was the first or northernmost of two "flat cars" loaded with telegraph poles or piling." Each of these "flat cars" was forty-one feet in length. The poles being sixty feet in length and too long to be carried on

one car were so placed or loaded upon the two flat cars as to leave a vacant space of about fifteen feet at the northern or front end of the north or first car and approximately seven feet at the southern end of the second car. The track at this point is upon an embankment. On the west and at the foot of the embankment a shallow creek runs "about parallel with the track" and at the time of the accident "there was about two inches of water in the creek." The creek bottom at that point is "solid rock" and the west side of the embankment, as described by defendant's witness Sherwood, a section foreman in charge of that part of the track. slopes "at just a little bit of an angle—is not quite perpendicular" to the creek. The same witness testified that by measurement it was "ten feet and four inches" from the top of the embankment to the "bottom of the creek." While plaintiff stated that distance as fifteen feet. The west side of the embankment was walled with rock "to hold the bank and keep it from caving in." The ties "extended beyond the rail about eighteen inches." Defendant's witnesses testified, that by actual measurement it was "thirteen feet and eight inches from the west rail" to the west edge of the embankment or "top of the rock retaining wall;" that "rock ballast extended about forty-seven inches out (west) from the west rail;" that the space covered by the rock ballast is "practically level;" that the remainder of the space to the west edge of the embankment is dirt and that the "dirt space" is lower than the rock ballast apparently sloping so that the top of the rock retaining wall or the west edge of the embankment is some "eighteen or twenty inches" lower than the west line or edge of the rock ballast. Plaintiff at one time testified that it was six feet from the west end of the ties to the west edge of the embankment and later stated the distance "from the west rail of the track to the creek bank" was, by measurements which he made, eight feet; presumably he designated the top of the rock wall as the "creek bank." The front or northernmost truck of the north or first of the two flat cars loaded with piling had gone off the track to the east, that is the west wheels of that truck were between the rails of the track at or near the east rail and the east wheels were on the ground east of the east rail of the track. Plaintiff, lived at Murphysboro, Illinois, and had been in defendant's employ for twenty-three years. He was called on this occasion to serve as a member of the "wrecking crew" which was sent to the scene of the derailment. The "wrecking crew" left Murphysboro at about 6:45 P. M., and proceeded, with a locomotive engine pushing a steam "derrick" or "hoist," to the point of derailment. This "wrecking crew" was composed of six men, Rodman, the foreman, Joe Franza, the engineer or operator of the derrick, Snyder, Muench, Nickens and plaintiff. The hoist or derrick was pushed to within about six feet of the north end of the derailed car. Chains were placed under the truck and extended and fastened

over the north end of the flat car so as to hold the truck "up against the car." A cable was then fastened to the north end of the car and attached to a hook "on the boom" of the derrick. Plaintiff assisted in these preparations. By means of the derrick, and at the order of the foreman, the car was lifted from the ground and suspended about five or six inches above the track. The foreman then ordered Franza, the derrick operator, to swing the car to the west which was done. The wheels of the car however were then, according to the plaintiff, too far east and out of alignment with the rails "about eight inches" while the foreman estimated the car out of alignment "three or four inches." It was dark and the men were working by the light of hand torches and the aid of a light of some kind on the derrick. The foreman, Snyder and plaintiff were working on the west side of the derrick and the train, Joe Franza on the derrick while the other two members of the wrecking crew, Muench and Nickens were on the east side of the train. We come now to plaintiff's version and testimony as to how he was injured. Plaintiff testified that as and immediately after the car was swung to the west as we have described, he and Rodman, the foreman, were standing on the west side of the derrick and Rodman then said to him: "Go back there and see how much it lacked of 'lining;'" that thereupon, and pursuant to the foreman's order, he went along the west side of the track "back to the trucks to determine how much the next swing would be;" that "something like seven or eight feet from the front end (the north end) of the derailed car" he "stooped down" so he could "look in behind the truck to see about how much it lacked" being in alignment; that he "had one knee on the end of a tie squatting down there;" that while he was in that position he heard Rodman, the foreman, "holler" to Joe Franza, the operator of the derrick: "Line it over Joe;" that he knew Rodman's order "meant that the car was to be lined over to the west" and that he "immediately tried to get up . . . jumped up trying to get out of the way but was struck by the sill pockets of the swinging car . . . it knocked me backwards and I went off of the embankment. . . . I was in a stooping position at the time it struck me. . . . I never did straighten up. I went right on off the embankment. The lick of the car was what put me over the embankment." On cross-examination plaintiff stated, "the car swung somewhere around six or seven feet west . . . that is, it covered that much space in the swinging movement and I was carried along with it." Plaintiff fell to the rock creek bottom and sustained serious and permanent injuries. No question is made as to the amount of the verdict. Plaintiff's testimony constitutes the whole of the evidence on his part as to what occurred and the facts and cause of the injury.

The negligence charged, and submitted by instructions to the jury, was that while plaintiff, pursuant to the order of the foreman, was

doing certain work which necessarily brought him in close and dangerous proximity to the car and in a position "where he would be injured in the event the car was moved" the car was moved, at the direction and order of the foreman, without any warning to plaintiff that it was about to be moved and without affording plaintiff a reasonable opportunity to reach a place of safety before starting such movement, and that plaintiff was struck by the moving car, "lost his balance" and fell sustaining the injuries described.

Defendant offered the testimony of eight witnesses. The testimony of two of these was confined to measurements and a description of the track, embankment and physical surroundings. Five of the other six witnesses for defendant, having been present at the place of derailment at the time plaintiff fell from the embankment, purported to testify to facts relating to and bearing upon the occurrence. The foreman, Rodman, testified, that after the first "swing" of the car to the west he, Snyder and plaintiff co-operated in trying to get the truck in alignment, "using our hands and feet trying to get the truck in line;" that he was at the "extreme (north) end" of the car; that "Snyder was south of me eighteen inches or a foot or two and Parrent (the plaintiff) was south of Snyder. . . . I did not order either Parrent or Snyder to go to that place or get themselves in that position . . . when I determined to swing the car (referring to the second swing at which time plaintiff claims to have been struck by the car) I said: 'Get in the clear boys' and then I said: 'Joe swing it a little to the west' and Joe did that" but the car did not "swing at once;" that before the car was moved plaintiff "had stepped back approximately five or six feet from the rail, . . . that put him approximately two feet from the car;" the overhang of a flat car is about thirty inches; that when the swing was made the piling on the car made a "cracking noise," "everybody was kinda backing," Parrent "went back kinda sideways" and "it looked like to me he made a jump when he went down" over the embankment; and the "car went about eighteen inches, or not over two feet, to the west" the car "swung over about its limit under the conditions, without breaking the stakes." Referring to that part of the testimony of Franza, the operator of the derrick, which relates to the second "swing" of the car, he says; that Rodman gave him the order to "line" the car "a little more to the west" and "I lined it to the west . . . I had to make two or three attempts before I moved the car on account of the pressure of the piling on the back of the car . . . the piling slipped . . . and the car swung about eighteen inches or two feet going off too far to the west of the west rail . . . it took me possibly a minute to swing the car after I got the order to move it. . . . I saw Parrent's body as he went over into the ditch." It will be borne in mind that Parrent was at all the times mentioned working on the west side of the derailed car.

Defendant's witness Snyder, a member of the wrecking crew, testified, that just before the last swing was made he and Parrent were ".looking at the alignment;" that he was "working at the front wheel of the front truck" (on the west side) "and Parrent was at the southernmost wheels" (of the same truck) "probably five feet south of me;" that Rodman moved "a little north" and was near and on the west side of the derrick when he gave the order, "Line it over, Joe;" that, "if any warning was given before Mr. Rodman gave that order I did not hear it" and "when the car commenced to swing I held on to it; a part of the time I had hold of the grab iron and I held on to the sill steps and the grab iron. I remained in that position until the swinging movement was completed and I don't think it went over two feet from the west rail; . . . . I couldn't say whether anybody was hit by the car or not; I was not looking. I didn't see Mr. Parrent go off at all." One of defendant's employees, Henderson (not a member of the wrecking crew), testified that he was at the scene of the derailment; that he was standing on the west side of the track about fifteen feet north of the derailed car (which would place him twenty to twenty-five feet or more north of where plaintiff claimed to be working); that the light from the derrick "reflected on the car and around on the ground;" that he heard the foreman order "the last swinging movement" and at that time saw Parrent standing about six feet west of the derailed car; that the car did not hit Parrent; that there was a "cracking fuss on the car" and Parrent "whirled, turned, went off sideways and fell into the ditch." Witness Harbour, a special agent in defendant's employ, stated he was sitting on top of a box car, the first car south of the two flat cars loaded with piling, and "was eighty-five or ninety feet from where the accident occurred;" that Parrent was "eight or ten feet from the wheels . . . on the west side" and "when the swing was made and this crash of the poles came Parrent ran back and it looked like he got overbalanced." Defendant's roadmaster, Stallings, testified that before the foreman gave the order to make the "last swing" "he told everybody to get out of the way;" "It took sometime, a little unusual, to make that swinging movement after Rodman gave the order. . . . I would say it took a minute or possibly longer. It went over west of the west rail of the track eighteen or twenty-four inches; I did not see the man go into the ditch . . . Snyder was in the clear—north of the end of the car . . . and in the event of a swing he would not be hurt." William Smith, a clerk employed by defendant, testified that he "heard Parrent make the statement that when the car swung he ran back, became overbalanced and fell over the bank." In his testimony Snyder also stated: "I talked with Mr. Parrent the evening the accident happened and heard him say that he started to get out of the way and saw he was going to fall and jumped

in the creek.'' · Defendant offered in evidence a . claim made by Parrent against an accident insurance company in which this question appears: ''How did the accident happen?'' The answer reads: '':Was raising a car and the car swung causing me and others to jump back and I fell about 15 feet down a bank.'' In rebuttal a shorthand reporter reading from his original notes stated that Franza testified at the taking of his deposition: ''The piling slipped and with the strain we had on it. the car moved over faster than we wanted it to.''

Appellant makes no question as to the admission or rejection of evidence, the instructions or the amount of the verdict. It stands. upon the one assignment that the trial court erred in refusing to direct a verdict for defendant at the conclusion of all the evidence in the case and in overruling its demurrer to the evidence. In support of this position appellant contends; (1) that ''there was no substantial evidence that plaintiff was struck by the swinging car'' and (2) . ''there was no substantial evidence that plaintiff was not amply warned of the movement of the car in sufficient time to enable him to reach a place of reasonable safety.''

■ · The case being under the Federal Employers' Liability Act appellant correctly · states that ''if it appears from the record that under · the applicable principles of law as interpreted by the Federal courts · the evidence was not sufficient in kind or amount'' to warrant and support a finding for plaintiff on the two issues noted, supra, appellant's contention should be sustained. [Gulf, Mobile & Northern Railroad Co. v. Wells, 275 U. S. 455; Chicago, Milwaukee & St. Paul Ry. Co. v. Coogan, 271 U. S. 472; Martin v. Wabash Ry. Co., 325 Mo. 1107, 30 S. W. (2d) 735; Koonse v. Missouri Pac. Ry. Co., 322 Mo. 813, 18 S. W. (2d) 467.]

Appellant cites· numerous Federal decisions in cases wholly or largely dependent upon inferences and dealing with what is denominated as merely a ''scintilla of evidence.'' ''The scintilla rule has been definitely and repeatedly rejected'' by the Federal courts. [Koonse v. Missouri Pac. Ry. Co., supra; Gunning v. Cooley, 281 U. S. 90; Small Co. v. Lamborn & Co., 267 U. S. 248; Penna. Railroad Co. v. Chamberlain, 288 U. S. 333.] To here analyze and review the many decisions, and the varying facts set out therein, cited by appellant in cases in which it is undertaken to establish negligence and causal connection by proof of facts and circumstances from which the elements essential to recovery must be found, if at all, by inference, would transgress upon the proper limits of this opinion since such citations do not appear applicable under the testimony and facts of the instant case. However, as illustrative of this line of decisions and as demonstrating the inapplicability thereof in the present case, we select the first of this list of cases cited by appellant's brief, Chicago, Milwaukee & St. Paul Ry. Co. v. Coogan, 271 U. S. 472.

That was an action under the Federal Employers' Liability Act. Plaintiff's intestate, a brakeman in defendant's employ, was run over and killed by a car in one of defendant's trains which was at the time being made up and coupled. There was no eyewitness of the accident and no direct evidence as to how it happened. An air pipe line extended along and near the track. A section of this pipe, about fifteen feet in length, had become "loosened and bent . . . upward" and "it had been in that condition for some months." "The east end of the part so loosened and bent was about 15 feet west of the place where the body of the deceased was found." Other circumstances were shown. Plaintiff's theory was that deceased's foot was caught under the pipe causing him to fall. The court held "the evidence is sufficient to warrant a finding that there was a breach of duty" in respect to the pipe. "But the precise question for decision is whether the condition of the pipe caused or contributed to cause the death of deceased. . . . As there is no direct evidence it is necessary to determine whether the circumstances are sufficient to warrant a finding of that fact. Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved and not themselves presumed." The circumstances shown by the evidence are further discussed and it is then said: "A finding that his foot was not caught under the pipe is quite as consistent with the evidence as a finding that it was" and "it is the duty of the trial judge to direct a verdict for one of the parties when the testimony and all the inferences which the jury reasonably may draw therefrom would be insufficient to support a different finding. The record leaves the matter in the realm of speculation and conjecture. That is not enough."

But in the present case recovery does not rest upon inferences, speculation, conjecture or mere scintilla proof. Upon consideration of the demurrer to the evidence, or motion for a directed verdict, appellant is met by plaintiff's positive, direct, specific, testimony as to every essential element, necessary to be shown, to make a case for the jury. Plaintiff's testimony does not leave the manner or cause of his injury in the realm of conjecture or speculation or to be arrived at by inferences from facts established but constitutes direct evidence of what he claims to be the facts concerning same and if believed would entitle him to recover. Defendant's evidence is that the foreman warned those working about and near the derailed car before each movement. Plaintiff testified, that he was ordered and sent by the foreman to examine the situation as to alignment of the wheels; that he was back and to the rear of the south wheels of the front truck and his position at that point is fixed by defendant's witness Snyder. Plaintiff testified that as he was about this work in compliance with the foreman's order and while he was in a stooped position looking under the car the foreman without any prior warn-

ing and without affording him an opportunity to reach a place of safety ordered the car swung to the west and that upon hearing the order he immediately tried to extricate himself from the dangerous position but as he was attempting to do so, and before he could so much as get back from the car and straighten up, the sill pockets of the swinging car struck him and knocked him "backward" and "right on off the embankment." Defendant's witness Snyder stated that he was at the front wheel of the same truck and that plaintiff "was probably five feet south of me." Defendant's evidence locates the foreman at the time he gave the order to swing the car as near and at the west side of the derrick, eight to ten feet north of Snyder. If the foreman gave a warning Snyder was in as good a position as any of those present to have heard same yet (referring to the last swing) Snyder said: "If any warning was given before Mr. Rodman gave that order I did not hear it." The foreman says that before he gave the order to swing the car he gave a warning: "Get in the clear boys." Defendant's evidence is that perhaps as much as a minute elapsed between the order to swing the car and the movement of the car. Plaintiff testified, as we have noted, that upon hearing the order and realizing the import thereof he "immediately tried to get out of the way . . . immediately tried to get up" and as "I was just raising up . . . right at the car . . . the swinging car struck me on the left shoulder." Plaintiff had testimony that Franza testified in a deposition that in making that movement "the piling slipped" and the strain caused the car to move "faster than we wanted it to." Defendant's foreman and two other witnesses testified that the car did not strike plaintiff. The position of these witnesses at the time of the accident and their opportunity to see and know plaintiff's situation at the time the movement of the car was commenced is described in the rather detailed statement of the evidence which we first made. We have made this resume of the evidence with the thought that it will suffice to show that as to the two issues upon which appellant claims there was no substantial evidence there was in fact ample evidence of a direct and substantial character warranting and requiring the submission of those issues to the jury.

The evidence was conflicting as our statement shows but there was evidence sufficient to support a verdict for either party and if the jury believed plaintiff's testimony they would be warranted in finding in his favor despite the evidence to the contrary. "Upon elementary principles that is enough to withstand a motion for a directed verdict." [O'Boyle v. Northwestern Fire & Marine Ins. Co., 49 Fed. (2d) 713.] We do not understand appellant to contend that if in fact plaintiff was injured under the circumstances and in the manner as stated by him in his testimony defendant would nevertheless not be liable in damages to plaintiff on account thereof. The writer may

not have grasped the full import and effect of appellant's argument but it seems to go largely to the weight of the evidence, the conflict therein and the greater credibility of appellant's witnesses. These however were matters for the consideration of the jury and doubtless were presented to the jury by appellant's counsel in the trial of the case. "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury." [Gunning v. Cooley, 281 U. S. 90.] The demurrer to the evidence does not involve the weight of the evidence and in determining a motion by defendant for a peremptory instruction "the court must resolve all conflicts in the evidence against the defendant" (Chesapeake & Ohio Ry. Co. v. Martin, 283 U. S. 209) and "the court should never withdraw a question from the jury unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' (Cases cited.) . . . The court must take the view most favorable" to the plaintiff and " 'if there is a conflict of the evidence or inferences a verdict should not be directed.' " [Atchison, T. & S. F. Ry. Co. v. Condos, 30 Fed. (2d) 669.] Where there is uncertainty arising "from a conflict in the testimony or because, the facts being undisputed, fairminded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." [Gunning v. Cooley, supra.] The credibility of the witnesses, the interpretation of testimony and "the weight of the evidence and extent and effect of contradiction," present questions for the jury. [Big Brushy Coal & Coke Co. v. Williams, 176 Fed. 529; Van Stone v. Stillwell & Bierce Mfg. Co., 142 U. S. 128; Crumpton v. United States, 138 U. S. 361; Wabash Railroad Co. v. Lewis, 48 Fed. (2d) 519; Northern Pac. Railroad Co. v. Conger, 56 Fed. 20; District of Columbia v. Robinson, 180 U. S. 92; Union Pac. Railroad Co. v. James, 163 U. S. 485; Engstrom v. Canadian Northern Ry. Co., 291 Fed. 736; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079.]

We have pointed out that plaintiff's testimony alone taken as true and with all conflicts in the evidence created by contradictory evidence on the part of defendant resolved against defendant constituted sufficient and substantial evidence requiring submission of the case to the jury and that if plaintiff's testimony was believed by the jury it was sufficient to warrant and support a finding in plaintiff's favor. Appellant's attack upon the credibility and weight of plaintiff's testimony as against contradictory testimony of witnesses for the defendant and the manner in which the number and credibility of defendant's witnesses is stressed prompts us to borrow an excerpt from the opinion of the Circuit Court of Appeals for the Eighth Circuit in Atchison, Topeka & Santa Fe Ry. Co. v. Condos, 30 Fed. (2d) 669. That case represents a very similiar situation. The court said: "The

fact that one witness (the plaintiff) is contradicted by many witnesses does not make the weight of the evidence so decidedly preponderant in favor of one side that a verdict contrary to it would be set aside." The court then quotes from United S. S. Co. v. Barber, 4 Fed. (2d) 625, as follows: "The testimony of the plaintiff himself fully supports the verdict and judgment. Its truth or falsity was a question for the jury. In this connection it is urged on behalf of the plaintiff in error that the testimony of plaintiff, in all matters material to a recovery, is specifically contradicted by a number of witnesses who had at least equal, if not better, opportunity than plaintiff to know the facts. This has no application to the sufficiency of the evidence, but, on the contrary, involves the question of the weight of the evidence and for that reason cannot be considered or determined by this court." [See, also, Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521; U. S. Express Co. v. Wahl, 168 Fed. 848; Union Pac. Ry. Co. v. James, 163 U. S. 485; Patterson v. Jacksonville Traction Co., 213 Fed. 289.]

Appellant advances the argument that plaintiff's testimony should be disregarded and rejected as being so contrary to the physical facts in evidence as to be manifestly false. It is asserted that it was physically impossible for plaintiff to have been injured in the manner and way stated in his testimony. This contention is predicated upon the testimony of three or four witnesses for defendant which is construed as showing that at the time the movement of the car was commenced plaintiff was then in a place of safety some five or six feet west of the west rail and also the testimony of defendant's witnesses that the car only swung about eighteen inches or two feet to the west with the opinion expressed by the foreman that in making that swing the car "swung over about its limit under the conditions without breaking the stakes." As we have shown the testimony is in sharp conflict as to plaintiff's position at the time the car started to swing. The jury might well have concluded that the testimony of defendant's witness Snyder tended to corroborate plaintiff's statement as to that. On cross-examination the plaintiff did estimate that in making the second swing to the west the car "covered a space . . . somewhere around six feet in the swinging movement." There is no direct testimony as to how far the boom of the derrick could be moved in either direction. The operator of the derrick Franza says the word in his deposition which the reporter read as "faster" should be read "farther" so that what he said would then read: "The piling slipped and with the strain we had on it the car moved over farther than we wanted it to." Defendant's evidence indicates that on the first swing the car was swung four feet or more to the west. The jury heard the testimony as to the physical surroundings, the distances, the sloping ground to the west of the rock ballast extending to the edge of the embankment, the manner in which the

car was moved or swung and how the piling was placed upon the two flat cars. It was for the jury to weigh plaintiff's testimony as to his position at the time the order was given to swing the car and how he was struck by the swinging car and knocked back to the west in the light of these physical conditions shown by the evidence. It would be going beyond our province to predicate a conclusion solely upon the evidence most favorable to defendant and say as a matter of law that it was physically impossible for plaintiff to have been struck and knocked over the embankment in the manner stated by him. The jury and the trial judge have believed to the contrary Kiefer v. City of St. Joseph (Mo.), 243 S. W. 104; Miller v. Schaff (Mo.), 228 S. W. 488. "It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [10 R. C. L. 1008; Schupback v. Meshevsky (Mo.), 300 S. W. 465; Gately v. St. Louis-San Francisco Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54.]

Appellant also argues that the statement as to how the accident occurred made by plaintiff in his claim, filed with the accident insurance company, that "the car swung causing me to jump back and I fell . . . down a bank" together with the testimony of two witnesses for defendant that plaintiff had said that when the car swung he ran back, "became overbalanced and fell over the bank" utterly wipes out and destroys plaintiff's testimony that he was struck by the swinging car and knocked over the bank and renders it unworthy of any credence whatsoever and for that reason the demurrer to the evidence should have been sustained. Plaintiff made no denial of these statements and, as respondent here, by a construction or interpretation which he places thereon, argues that the statements are neither inconsistent with nor contradictory of his testimony at the trial. However taken as being contradictory to plaintiff's testimony they are not for our consideration on the demurrer to the evidence but go only to the weight and credibility of plaintiff's testimony which is for the jury. As determinative of this argument we cite and quote from the following cases announcing the applicable rule of law. At the trial of the case of Steele v. K. C. So. Ry. Co., 302 Mo. 207, 257 S. W. 756, it was shown that at a former trial of the same case the plaintiff had testified to a state of facts contrary to and contradictory of his testimony in the instant trial and that his testimony at the former trial absolved defendant of liability. On the theory that at the first trial plaintiff had made a solemn admission against liability and was bound thereby the trial court gave the peremptory instruction asked by defendant. This

court held, "That upon a subsequent trial the plaintiff is not absolutely bound by his testimony at a former trial; the jury has the right to consider his testimony given at the subsequent trial, notwithstanding it is shown that his testimony at the former trial tended to show the existence of a contrary state of facts. It is for the jury to say at which time he told the truth. It is, therefore, necessary for us to hold that the trial court erred in giving the jury its peremptory instruction to find the issues in favor of defendant." In Davidson v. St. L. & S. F. Ry. Co., 301 Mo. 79, 256 S. W. 169, it was said: "The general rule is that where a plaintiff at one hearing testifies a given way, and at a later hearing testifies to the opposite, it is for the jury to determine what credence it will give to the evidence given before them, as impeached by what such party said at the previous hearing." Erie Ry. Co. v. Rooney, 186 Fed. 16, holds that the contradictory statements of a party made both in and out of court are for the jury in determining the weight of his testimony and in that case this comment is found: "The variance between plaintiff's original and amended petitions, and the testimony as to his admissions to defendant's claim agent, were proper subjects for consideration by the jury, as affecting the credibility of the plaintiff. We are unable to say that the jury, who saw and heard the plaintiff, were not justified in believing him, notwithstanding the discrepancies referred to." And what is said in Kinghorn v. Pennsylvania Railroad Co., 47 Fed. (2d) 588, is most pertinent. That case had been tried once before and the plaintiff's testimony in this second trial "differed" from that given in the first trial. It was "urged that he is bound in this trial by his previous testimony." The court said: "In the sense that a party cannot play fast and loose with the facts, this is true. . . . It is for the jury to consider his testimony at both times; determine which time, if either, he was correct; treat previous conflicting admissions as evidence in chief as well as impeachment; consider how far, if at all, he is impeached; and find the actual facts in the light of all the evidence."

We hold the case was properly submitted to the jury and as the determination of the issues of fact made by the jury is conclusive upon this court the judgment must be affirmed. It is so ordered. *Sturgis* and *Hyde*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Hays*, *J.*, absent.