HELEN BLOECHER v. MARY DUERBECK, Executrix of the Estate of WILLIAM DUERBECK, Appellant.—92 S. W. (2d) 681.

Division One, March 10, 1936.

536

*Wayne Ely* and *Tom Ely, Jr.*, for appellant.

538

*Kratky, Soffer, Nessenfeld & Cox* for respondent.

BRADLEY, C.—This is an action for personal injuries received by plaintiff on December 8, 1927, from the explosion of an Arcola hot water heating plant. The cause was tried to a jury and plaintiff had verdict and judgment for $20,000. Motion for new trial was overruled and defendant appealed.

The cause was filed November 16, 1928, and thereafter, an amended petition was filed. Defendant filed answer to the amended petition. This is the second appeal in this cause. The first trial resulted in a judgment in favor of plaintiff for $35,000. The opinion on the first appeal is reported in Bloecher v. Duerbeck, 333 Mo. 359, 62 S. W. (2d) 553, 90 A. L. R. 40, wherein it appears that the judgment was reversed and cause remanded because of the trial court's refusal of an instruction asked by defendant. The cause was filed against William Duerbeck, who died while the first appeal was pending, and the cause was revived in the name of his widow and executrix. For convenience, we shall treat the cause as between plaintiff and William Duerbeck, referring to the latter as defendant.

Defendant owned a two-story building facing south on Delor Street, St. Louis, and consisting of several rooms above and below. The first floor was occupied by business houses and the second floor was divided into apartments for living quarters. Sam Vitale occupied the first floor room known as 3521 Delor Street. Vitale, a shoe cobbler, occupied this room with his family consisting of his wife and baby about three months old, at the time of the explosion, and had occupied the room since February, 1927, and was still there at the time of the second trial. Plaintiff is a sister of Mrs. Vitale, and on the day of the explosion, plaintiff, a college student and at the time nineteen years of age, went to the Vitale home about four P. M. for a brief visit. The premises occupied by Vitale extended fifty feet north and south and fifteen feet east and west, and the separate basement thereunder was used in common by Vitale and the tenant immediately over Vitale's quarters. In the rear or north end of the Vitale room was the kitchen which was fifteen by fifteen feet; then next was the bedroom, same size as the kitchen, and in front was the shoe shop which was twenty by fifteen feet. These rooms were separated by partitions, but the partition between the shoe shop and the bedroom did not extend to the ceiling. The

Arcola was in the northeast corner of the kitchen. Shortly after plaintiff came to the premises on the day of the explosion, she and her sister, Mrs. Vitale, went from the shoe shop to the kitchen to give the baby a bath, and shortly thereafter the explosion occurred, resulting in serious injury to plaintiff, and no point is made on the amount of the verdict. The Arcola heating system was installed by Murphy & Tecklin, plumbers and gas fitters, but Murphy did the work, or most of it. Murphy, with his family occupied the apartment over the Vitale quarters.

Plantiff alleged four grounds of negligence; (1) That the defendant and his agents caused and permitted the heating system to be set up in a manner dangerous and not reasonably safe, in that it was installed and set up in such way that excessive quantities of air, steam and pressure were likely to form and accumulate and cause an explosion, and that there was no adequate provision for the escape of excessive quantities of air, steam and pressure; (2) that defendant failed to exercise ordinary care to employ competent men to install the system, but employed incompetent and inexperienced men, and that defendant, by the exercise of ordinary care, could have known that the agents employed were incompetent and inexperienced and that as a direct result of such failure or care, the heating system was likely to be installed in a manner that was dangerous; (3) that defendant and his agents negligently caused and permitted the heating system to be installed without an altitude gauge, pressure gauge or thermometer when by the exercise of ordinary care, he could have known that such devices were necessary for the reasonably safe use and operation of the heating system, and that the failure to have such devices was likely to cause an explosion; (4) that the defendant negligently failed to have the heating system equipped with a suitable safety relief valve to relieve the pressure that he knew, or by the exercise of ordinary care could have known, was likely to be created in the system by the accumulation of excessive quantities of air and steam. The answer is a general denial and a plea that the heating system was installed by an independent contractor, and that defendant had no control or right to exercise any authority over the independent contractor concerning the installation of the system. And defendant further pleads in the answer that the system and the premises where the system was installed were in the exclusive possession and control of Sam Vitale, the tenant and his wife, and that defendant had neither the duty nor privilege of inspecting the heating system after installation.

Defendant assigns error (1) on the refusal of the request for a directed verdict at the close of the case; (2) on the giving of plaintiff's Instruction No. 1; (3) on the refusal of instructions asked by

defendant; (4) on the admission of alleged incompetent, irrelevant and immaterial evidence offered by plaintiff; and (5) that defendant's counsel was unreasonably restricted in cross-examining plaintiff's witnesses and that the court made prejudicial comments on the evidence, and asked defendant's expert witnesses improper and prejudicial questions. We shall rule these assignments in the order stated.

Defendant's assignment on the refusal of the request for a directed verdict involves two questions, viz.: The sufficiency of the evidence to take the case to the jury, assuming that no question on the independent contractor phase of the case is involved, and the question on the independent contractor phase of the case. Prior to the installation of the Arcola, the premises occupied by Vitale were heated with stoves, one in the kitchen and one in the shoe shop. Vitale suggested and requested the installation of the Arcola, this suggestion and request being made to defendant's son, and defendant agreed to install the Arcola, and Vitale, the tenant, agreed to pay $5 additional rent. The furnace part of the Arcola was, as above stated, placed in the northeast corner of the kitchen and faced west. From the rear of the Arcola, a two and one-half inch pipe, called the "riser pipe" extended up to near the ceiling, then turned west and ran under and near the ceiling and extended to or near the west wall, then turned south, passing through the partition between the kitchen and the bedroom to a point midway of the bedroom and then descended to the radiator in the bedroom, and at a point on the pipe descending to the bedroom radiator and a short distance below the top of the bedroom radiator, the pipe extended on south to the radiator in the shoe shop. The return pipe from the radiators back to the furnace part of the system in the kitchen was placed along and near the ceiling in the basement. At the point where the riser pipe turned west, which may be said to be over the furnace part of the Arcola, a half-inch pipe was connected with the upside of the riser pipe elbow and this half-inch pipe extended up about three inches and then turned downward some four or five feet. At the lower end of this downward turned half-inch pipe was a petcock or valve, which is called the air vent. Water was let into the system by a valve under the furnace and over the floor and connected with the city water. The system had no thermometer, pressure gauge or altitude gauge. Vitale was instructed by Murphy, who installed the system, that in turning the water into the system, to first open the petcock at the end of the downward turned half-inch pipe over the Arcola, and then open the valve connecting the city water, and leave both open until water ran freely from the half-inch pipe, which freely running water would be the indication that the system was full. Attached to the return line in

the basement and about fourteen or eighteen inches from the furnace, there was a Mueller safety relief valve designed to automatically release upon excessive pressure, and to relieve any excessive pressure upon release. The system was what is- called a "closed" system and the expansion tank was placed in the kitchen above and to one side of the furnace part of the system. The system was what is called a 6 H system, that is, what we call the furnace part contained 6 sections.

When such system, properly installed, is being filled, the water rises equally in all parts, the boiler, pipes and radiators, and then flows into the expansion tank, compressing the air therein. The system is filled with air before being filled with water, and it is necessary, so all the evidence on the point shows, to have an air vent at the highest point in the system, in order to permit the escape of air as the system fills with water. Unless an air vent is placed at the highest point, the air is pocketed at such point, and if the air is pocketed, it acts as a block or bar and prevents proper circulation of the water. There was an air vent on the system installed, as above stated, but according to plaintiff's evidence, the high point of the air vent pipe was about five inches lower than the high point of the pipe that extended to the bedroom radiator.

The system had been installed and was in operation for about a month prior to the explosion. The weather prior to December 8th, the day of the explosion, was mild, but on the night of December 7th, it turned cold and on December 8th, the temperature was around six or eight degrees below zero. The fire in the furnace went out on the night of December 7th, and on the morning of the 8th, Vitale, according to his evidence, about seven o'clock, opened the petcock at the terminus of the downward extending half-inch pipe, turned on the city water until water ran freely from the petcock. He then started a fire, using paper, kindling and a half bucket of coal. About nine, nine-thirty or ten o'clock, Vitale put in the furnace two and a half buckets of smokeless coal and when the fire was burning well, he, following directions, closed all the drafts, except the damper in the smoke hood. About four o'clock in the afternoon and just before Mrs. Vitale went into the kitchen to bathe the baby, Vitale shook the grates and opened the drafts and the ashpit door, but did not put in any coal. He "figured there was more than a bucket full of coal in the stove and I didn't need any coal." Between fifteen and thirty minutes after Vitale shook the grates and opened the drafts the explosion occurred.

It was plaintiff's theory "that the high point of the system had no air vent, which fact resulted in the formation of an air pocket and the resultant obstruction in the circulation of the water in the pipes. This in turn resulted in the overheating of the water in the

boiler, building up to such a point that an internal steam explosion resulted.'' This theory could be correct, according to defendant, only when the Mueller safety relief valve failed to function. The valve was adjusted to release at twenty-six pounds pressure, and was properly tested, according to defendant's evidence, and was functioning properly when installed, and according to plaintiff's evidence, this valve was tested shortly after the explosion and was found to function, that is, release at the pressure stated. But plaintiff's theory was that the relief valve was frozen, when the explosion occurred, which prevented its function. There was an outside door in the north end of the basement, which door was open on the night of December 7th, and plaintiff's evidence was that this door could not be closed. The Mueller safety relief valve was four inches from the return line, but connected therewith, and defendant argues vigorously that it was impossible for this valve to have remained frozen from the time fire was first started at seven A. M. until four-fifteen or four-thirty P. M., when the explosion occurred.

The system, since installation, had ''knocked,'' sometimes violently, every day, except on the day of the explosion it did not knock, and there had been leaks since installation at various places and especially at the elbow where the pipe turned downward to the bedroom radiator, which point, according to plaintiff's evidence, was the high point in the system.

Plaintiff's expert witness, Harry A. Geauque, was asked the following hypothetical question:

''Mr. Geauque, assume that a closed Arcola system with an expansion tank and with a 6 H boiler was so constructed about November 9, 1927, that the top of the main riser pipe, which is about two and one-half inches outside diameter above the heater, is between eight and nine inches from the ceiling, that at that point, namely, the top of the main riser pipe, there is a vent pipe rising from three inches above the elbow which (pipe) is turned downward a distance of five feet; assume that the vent pipe is about one-half inch outside diameter, and that at the bottom of the vent pipe is a valve; assume that the pitch of the pipes from the top of the main riser pipe is steadily upward so that the top of the pipe in bedroom where the first drop to the radiators occurs is five to six inches higher than the top of the main riser pipe; assume that there was no air vent at that point, namely, the point above the radiator in the bedroom, and that said point is the highest point of the system; assume that the system has no thermometer and that the system has no altitude or pressure gauge; assume that the system knocked almost every day from the date of installation, except December 8, 1927, and that water leaked almost every day at various places along

the system; assume that a relief valve was attached to the return line in the basement about eight feet from the outside door of the basement, and that said basement door was opened and could not be closed; assume that there was no heat in the basement; assume that the weather prior to December 8, 1927, was mild, but that during the night of December 7, 1927, it turned very cold; assume that the fire in the Arcola had been permitted to go out on that night and that on the morning of December 8th, the weather was below zero; assume that about seven or seven-fifteen A. M., on December 8th, Mr. Vitale opened the city water supply into the boiler, turned on the valve attached to the end of the vent pipe and when the water ran out of the vent pipe, turned off the city water; assume that this practice was followed every morning since the installation; assume that at that time, namely, at seven or seven-fifteen A. M., December 8th, a fire was built in the Arcola with paper, wood and about half a bucket of coal; assume that at about nine-thirty or ten A. M. of that day, the fire box was filled completely with smokeless coal and that about fifteen minutes later the fire was burning well; assume that the drafts were closed and the damper at the smoke hood always remained open; assume that the rooms were comfortably warm, for Mr. Vitale who was wearing a sweater and a shoemaker's apron, in addition to his other clothing, and that the radiators the furthest away, being that one in the shop, some thirty feet away from the Arcola, were warm; assume that about four P. M. the drafts and the ashpit door were opened on the Arcola; assume that about thirty minutes later an explosion occurred with the result that the middle four sections of the boiler were separated from the front and rear sections, the front section being shattered; assume the middle four sections being thrown forward a distance of five to seven feet, the back section remaining against the wall, still attached to the main riser pipe, but with several breaks in the section, are you able to form an opinion as to the cause of that explosion?''

The witness answered that he was able to form an opinion and gave it as his opinion that the explosion was a steam explosion.

Plaintiff's expert witness, Frank Carter, testified that in his opinion, the explosion was a steam explosion. Defendant's expert witnesses gave it as their opinion that the explosion was not a steam explosion, but that the explosion occurred in the fire box itself, and from the effect produced, said that it was such as would result from dynamite or blasting powder.

Defendant's assignment on the refusal of the request for a directed verdict involves two questions, as above stated, viz: (1) The sufficiency of the evidence to take the case to the jury, assuming that no question of independent contractor was involved, and

the question on the independent contractor phase of the case. When this cause was here on the first appeal, Bloecher v. Duerbeck, 333 Mo. 359, 62 S. W. (2d) 553, 90 A. L. R. 40, we ruled both these questions against defendant. And we ruled likewise in the companion case of Vitale v. Duerbeck, 332 Mo. 1184, 62 S. W. (2d) 559. On the present appeal, able counsel for defendant again urge both these questions. There is no material difference in the evidence presented in the present record and in the former, but we have again carefully examined the record and reach the same conclusion on these questions as on the former appeal. And we reach the same conclusion on these questions in the companion case of Vitale v. Duerbeck, which is here on a second appeal, and the opinion by HYDE, C., is handed down along with this opinion. 338 Mo. 556, 92 S. W. (2d) 691. It is contended that plaintiff's theory as to the cause of the explosion is impossible, and especially as to the freezing of the safety relief valve. In Parrent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068, we ruled a similar contention. Quoting with approval, 10 Ruling Case Law 1008, we said: "It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [See, also, Schupback v. Meshevsky, 300 S. W. 465; Gately v. St. Louis-San Francisco Railroad Co., 332 Mo. 1, 56 S. W. (2d) 54.] We do not think that plaintiff's theory as to the cause of the explosion is "manifestly impossible and untrue," but, under the evidence, was for the jury. Counsel for defendant also contend that in the instant case, plaintiff's witnesses so contradicted themselves while testifying, and testified contrary, in some particulars, to their evidence at the former trial, that their evidence is without probative value, and supporting this contention, defendant cites Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, 647; United States v. Kiles, 70 Fed. (2d) 880; State ex rel. Mochnick v. Andrioli (Iowa), 249 N. W. 379; Goater v. Klotz (Pa.), 124 Atl. 83; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819, and Polokoff v. Sanell (Mo. App.), 52 S. W. (2d) 443. It is true that there were some contradictions made by plaintiff's witnesses, Sam Vitale, Frank Carter and Harry A. Geauque, and Vitale and Carter testified in some instances contrary to their former evidence. Geauque was not a witness at the first trial. In Parrent v. Mobile & O. Railroad Co., supra, a contention was made that the plaintiff had made such contradictory statements that his evidence was "unworthy of any cred-

ence whatsoever.'' In ruling the contention, we said: "At the trial of the case of Steele v. K. C. So. Ry. Co., 302 Mo. 207, 257 S. W. 756, 759, it was shown that at a former trial of the same case the plaintiff had testified to a state of facts contrary to and contradictory of his testimony in the instant trial and that his testimony at the former trial absolved defendant of liability. On the theory that at the first trial plaintiff had made a solemn admission against liability and was bound thereby, the trial court gave the peremptory instruction asked by defendant. This court held: 'That upon a subsequent trial the plaintiff is not absolutely bound by his testimony at a former trial; the jury has a right to consider his testimony given at the subsequent trial, notwithstanding it is shown that his testimony at the former trial tended to show the existence of a contrary state of facts.' It is for the jury to say at which time he told the truth." [See, also, Davidson v. St. L.-S. F. Ry. Co., 301 Mo. 79, 256 S. W. 169; Kinghorn v. Pennsylvania Railroad Co. (C. C. A.), 47 Fed. (2d) 588, and Erie Railroad Co. v. Rooney (C. C. A.), 186 Fed. 16.] If such is true of a plaintiff's evidence, it certainly would be of plaintiff's witnesses in the cause at bar, who on the last trial, testified in some instances contrary to their evidence at the first trial. And, as above noted, plaintiff's witness Geauque was not a witness at the first trial. But defendant contends that plaintiff's witnesses, Vitale, Carter and Geauque, so contradicted themselves at the second trial as to destroy the probative value of their evidence. There were, as stated, some contradictions in the evidence of these witnesses at the second trial, but not such, in our opinion, as to justify a ruling that their evidence is without probative value.

It would serve no useful purpose to again discuss the law relative to the defense of independent contractor. That subject was considered somewhat at length in our former opinion by STURGIS, C., and we refer to that opinion for a discussion of the law on that subject. Also, we make reference to the American Law Reports annotation, 90 American Law Reports 50, et seq., and U. of Mo. Bulletin, 50 Law Series 62. We think that the rule in this State on the independent contractor question is correctly stated in our former opinion, 333 Mo. 359, 62 S. W. (2d) l. c. 555, as follows: ''The serious question for our consideration is whether, granting that the persons who installed this heating system for the defendant, owner of the building, were independent contractors, as that term is defined in law, the defendant can escape liability for an injury caused by a negligent defect in the manner of installing the heating plant such as is shown here, by intrusting the doing of such work to an independent contractor. In considering this question, we must remember that defendant undertook to install this new heating plant

in the rented premises for his own advantage in the increased rent to be paid by his tenant. It was wholly with defendant as to whether he would hire the work done in the usual way or let the job to an independent contractor for a lump sum. Before this accident happened, the work had been completed and paid for, accepted by defendant as completed, and the contractor discharged. The same accident might have happened a year or two later and the same defense interposed. The injury was not to one of the employees of the contractor, or caused to a third person by the negligence of such an employee during the course of the work, as to whom and the contractor the relation of master and servant existed. It might be that in such a case the independent contractor alone would be responsible. This accident was the result of a permanent defect in the installation of the heating plant, which would be corrected, if at all, by the owner of the premises. The accident was the result of the defective and dangerous condition in which the premises were left after the work of installation of the heating system was completed and it became part of the demised premises and was accepted by the landlord. For this defective and dangerous condition which inhered in the completed work, we think the landlord should be held liable notwithstanding he caused the work to be done by an independent contractor.''

In 50 M. B. L. 62, supra, the University of Missouri, Law Series Bulletin, is a note on the independent contractor question in the cases of Bloecher v. Duerbeck, 333 Mo. 359, 62 S. W. (2d) 553, and Vitale v. Duerbeck, 332 Mo. 1184, 62 S. W. (2d) 559. This note makes reference to authorities in other jurisdictions as well as in our own, and we think our holding on the question is in line with the weight of authority, and as pointed out in the note in the Law Series Bulletin, our conclusion is in line with Restatement of the Law of Torts by American Law Institute. [See Reinstatement of Law of Torts, sec. 364(c).]

■ Error is assigned on plaintiff's Instruction No. 1. It is contended that the instruction is broader than both the pleadings and the evidence; that it was broader than the pleadings in that it permitted the jury to find that the safety relief valve ''was installed in a place where it was likely to freeze and become inoperative;'' and that the instruction was broader than the evidence in that it permitted the jury to find that air and steam pressure accumulated in the heating system; that the safety relief valve froze; and that air and steam pressure caused the explosion. It is also contended that the instruction ''assumes that the failure to equip the heating system with a thermometer and altitude gauge was negligence and assumes that if air and steam accumulated in the system, it accumulated as a result of negligence.'' It is alleged in the pe-

tition that the system (and the safety relief valve is a part of the system) was "installed and set up in a manner that was dangerous, negligent and not reasonably safe, in that said system was installed and set up in such a way that excessive quantities of air and steam and pressure thereof were likely to be caused to form and accumulate." If the safety relief valve froze, and plaintiff's evidence tended to so show, then the system was "set up in a manner that was dangerous" as the petition alleges, and as the evidence, both by plaintiff and defendant, shows. Plaintiff's evidence tended to show that, in the system as set up, air and steam pressure would likely accumulate, and that the safety relief valve froze. Frank Carter, a heating contractor so engaged since 1906, testified as a witness for plaintiff, that he was acquainted with the Arcola heater; that he had installed about a hundred of them all told, he supposed; that he was at the Vitale premises "a few days after the explosion" and made an inspection. He was asked on direct examination this question: "Mr. Carter, from your experience, now, as a heating contractor, from your inspection of the installation, of the actual installation and from your inspection of the remaining parts of the Arcola both now and at the time you first saw them, two days after the explosion, are you able to form an opinion as to the cause of the explosion?" The witness answered that he was able to form an opinion, and gave it as his opinion that the explosion was caused by excessive steam and water pressure. And on cross-examination, witness Carter testified: "Q. And you don't know now whether this Mueller valve was frozen or whether the return line to which this Mueller valve was attached to was frozen? A. Well, yes; it was froze; no question about it. Q. No question about it? A. No question about it. Q. Which was frozen? A. The valve did not relieve. Q. Which was frozen? A. I don't know which one. Q. If you don't know which one, let's confine your testimony to what you know, if you don't mind, you said no question about it. A. Yes, sir. Q. No question about what? A. If the valve had not been frozen it would have relieved, wouldn't it? Q. I am asking you. A. I am telling you it would relieve. Q. All right; that is, if this was a steam explosion; is that what you mean? A. Yes, sir. Q. If it was a fire box explosion the function of this valve would have nothing to do with it? A. Fire box explosion? Q. Yes; from coal or anything else inside the fire box? A. No, sir. Q. Whether coal, firecrackers, chicken feed? A. No. Q. Or whatever might have been? A. No. Q. Fire box explosion, this valve, the functioning of this valve, would have nothing in the world to do with this explosion? A. Not a thing. Q. You don't know from anything you saw down there, or from your inspection of this valve or in any other way except in your opinion, you don't know

whether this valve was frozen, do you? A. Well, in my experience it would have relieved if it had not been frozen." Defendant says in his written argument that "there was no evidence from which the jury could have decided that it (the safety relief valve) froze, except the speculation and conjecture of Frank Carter," and then says that Carter's evidence "on that question was so conflicting and contradictory as to form no basis for such a finding." In ruling what we may term the demurrer to the evidence, we considered the subject of contradiction in the evidence of plaintiff's witnesses, and what we say here is pertinent to the demurrer. We might say, too, that the mere fact that a witness in a long and vigorous cross-examination, as was the case with the witness Carter, may in some particulars give contradictory answers, is not conclusive that there is nothing in his evidence of probative value. The cross-examination of Carter covers 78 pages of the record and Carter had testified as to this explosion on previous trials, and he was asked minutely and at length as to his previous evidence. But considering the evidence of Carter and Geauque, there is no substantial ground to support the complaint against plaintiff's Instruction No. 1 that it is broader than the evidence.

Does plaintiff's Instruction No. 1 assume as defendant contends? Defendant says, as above stated, that the instruction assumes that the failure to equip the system with a thermometer and altitude gauge was negligence, and assumes that if air and steam accumulated, it accumulated as a result of negligence. So far as pertinent to this assignment, Instruction No. 1 reads: "If you so find that said suitable safety valve was installed in a place where it was likely to freeze and become inoperative (if you so find), and that so placing a relief valve was negligence (if you so find), and that such relief valve did freeze and become inoperative (if you find such freezing), and if you further find that as a result of the aforesaid negligence, if any, air and steam and pressure thereof did form and accumulate in said system and that such air and steam, if any, and pressure thereof, if any, caused an explosion in the boiler of said heating system (if you find that an explosion occurred in the boiler), and if you further find and believe from the evidence that said heating system was installed without it being equipped with an altitude or pressure gauge and thermometer, and if you further find that an altitude or pressure gauge and thermometer were necessary attachments for the reasonably safe use and operation of said system (if you so find), and if you further find that the failure to so provide such attachments was negligence (if you so find)." We do not think that there is merit to defendant's contention respecting the complaint that it assumes as contended.

■ Defendant assigns error on the refusal of his instructions D, E, F and H, but briefs only D, E and H. Instruction D defines an independent contractor. We have, supra, disposed of the independent contractor question. Instruction E involved, by indirection, the subject of independent contractor and was properly refused. Instruction H is as follows: "The Court instructs the jury that among the charges of negligence in this case is the charge that defendant negligently omitted to have the heating system mentioned in the evidence equipped with a suitable safety relief valve to relieve the pressure that might be created in said system and you are instructed that that charge is withdrawn from your consideration and you cannot find for plaintiff on that ground."

Instruction H would have confused the issues. There was nothing in the evidence tending to show that the safety relief valve was inherently defective. It may have been suitable if properly installed in the system, but its *suitableness* depended on its installation as a part of the system and if installed in such a manner that it did not function, the result would have been the same as if its lack of function, in the crisis, had been due to inherent defects. Also, we do not overlook the facts that in the companion case of Vitale v. Duerbeck, supra, opinion in which, as stated, is filed concurrently with this opinion, there was evidence tending to show that the safety relief valve was installed upside down. We judicially notice the record in the companion case. [State ex rel. Ponath v. Hamilton (Mo.), 240 S. W. 445; Runnels v. Lasswell (Mo. App.), 272 S. W. 1032.]

As supporting the contention that it was error to refuse Instruction H, defendant cites Brand v. Herdt (Mo. App.), 45 S. W. (2d) 878; Estes v. Desnoyers Shoe Co., 155 Mo. 577, 56 S. W. 316; Crossno v. Terminal Railroad Association, 333 Mo. 733, 41 S. W. (2d) 796; Willis v. Applebaum (Mo. App.), 26 S. W. (2d) 823. The Brand case, so far as concerns the question here, rules that "the office of instructions is not only to inform the jury as to the law of the issues raised, but that upon proper occasion, where evidence has been admitted of a character which might easily lead to the raising of a false issue, it is proper to give instructions to guard against the consideration of such false issue." The Estes case rules to the same effect. There was no evidence admitted concerning the safety relief valve "which might easily lead to false issues." Crossno v. Terminal Railroad and Willis v. Applebaum, supra, so far as concerns the question here, rule that where a plaintiff alleges several grounds of negligence and goes to the jury without instructions, except on the measure of damages, that it is error to refuse withdrawal instructions withdrawing from the consideration of the jury those assignments of negligence not supported by the evidence.

(We might say, parenthetically, in passing, that the practice of submitting a cause to a jury without instructions no longer obtains. [Dorman v. East St. Louis Ry. Co., 335 Mo. 1082, 75 S. W. (2d) 854.] There was no situation in the instant case to justify defendant's Instruction H.

■ Error is assigned on the admission of alleged incompetent evidence. It is claimed that prejudicial error was committed in permitting witness Vitale to testify that he had not attended school in the United States. Counsel for plaintiff asked Vitale, "How many colleges have you attended in the United States?" Objection was made and after some argument on the objection, this question was asked, "Have you attended any school of any kind since you came to this country?," and over objection and exception, the witness answered, "No, sir." Then the witness was asked: "What is the extent of the school training you had in Italy?" This objection was made: "Mr. ELY: I object to the question, your Honor, as being immaterial, like for the purpose to be stated; this witness has not shown that he does not understand any questions that have been asked him; as a matter of fact, he has, to my mind, shown he does understand every question that is asked him." The COURT, after the objection was made, remarked: "Well, it is quite apparent that the witness is having some difficulty with the language, although I don't know that schooling in Italy would have any bearing here, a question of whether he has any knowledge of the language here that we are concerned with." The objection was sustained. Then the witness was asked: "Do you read and write the English language? A. No, sir." Objection to the last-mentioned question was made, but immediately withdrawn. In the written argument, defendant says of the evidence as to Vitale's schooling: "It is apparent that this testimony was given in an effort to explain away the positive contradictions in Sam Vitale's testimony, and to impress the jury with the belief that Sam Vitale had contradicted himself because of his ignorance when, as a matter of fact, he was not shown to be ignorant, and he did not testify, and was not asked to testify, that he misunderstood any question put to him on cross-examination." Defendant made no objection to the remarks of the court and, as stated, made no objection to the evidence of the witness that he could not read or write the English language. In this situation, there is nothing to complain about, except that the witness was permitted over objection and exception to testify that he had not attended school in the United States, and defendant could not have been seriously prejuiced by such evidence.

■ Defendant contends in his points and authorities and in the written argument that error was committed in permitting plaintiff to put on a demonstration before the jury. This assignment is not

included specifically in the formal assignments, but may be considered as embraced under the assignment on the admission of incompetent evidence. The witness, Geauque, put on a demonstration before the jury with an improvised model made with a copper boiler and glass tubes. The purpose of the demonstration, as we understand the record, was to give a visual illustration of the difference in the function of the heating system when the air vent was at the highest point in the system, and when it was not at such point. During the demonstration that counsel for plaintiff was endeavoring to make, counsel for defendant and the court asked the witness as many or more questions regarding it, as did counsel for plaintiff. The record upon the demonstration covers about twenty-eight pages and is in effect an informal discussion of the model and its workings between the witness, counsel for both sides and the court. Counsel for defendant made an objection occasionally, but the court did not rule except in one instance, and no exception was saved to the failure of the court to rule. In such instances there is no point here for review. During the demonstration, counsel for defendant made this objection: "I object to making a demonstration with this little system he has got here, because it is too much out of proportion as shown by the measurements that have been given in the record by this witness." The court did not rule at once. The record, immediately following the objection, shows as follows: "The COURT: Q. I am going to ask you (witness) this question: Would the space, the differential, there was only a difference of two inches in the actual heater involved here; would that make any difference in this apparatus, the difference of two inches? A. The height would be absolutely unimportant except where it might be a contraction in the thickness of the pipe, the difference, so that a part of it would be in one end of the pipe at the bottom and the other end of the pipe at the top of the pipe, that is, of the cross section of the pipe. Q. But the height, that is insufficient to create a differential from one to the other regardless of the formation of the differential, would not make any difference in the formation of the pocket? A. No, sir. Q. The air pocket? A. Form an air pocket just the same. The COURT: All right, then; go ahead. Objection overruled. Mr. ELY: Note exception." We do not think defendant has any ground to complain as to the demonstration.

Defendant contends that his cause was prejudiced by an unreasonable restriction upon the latitude of cross-examination of plaintiff's witnesses, and by alleged prejudicial remarks of the court and by questions asked defendant's witnesses by the court. There is no merit of substance in these assignments. The complaint respecting unreasonable restriction of cross-examination concerns mostly the cross-examination of plaintiff's expert witness, Geauque.

Shortly after the cross-examination of this witness commenced the court remarked about "taking up so much time" and asked the purpose of a question. Counsel stated the purpose and excepted to the court "questioning me as to what was the idea of taking up so much time." The court remarked: "I don't know what purpose you have in it, the record, whatever it is, making an exception, go on and make it, got to use some judgment in the matter with the speed at which this trial is progressing." Counsel continued the cross-examination on the subject in hand when the interruption occurred. On direct examination, witness Geauque testified that in his opinion the boiler was foaming when the explosion occurred and on cross, he was asked if it was possible for the boiler to foam as long as it was closed. The answer was: "From the normal term of foaming, where foam is produced I would answer his question no; from the scientific phenomena of which is normally known as foaming, I would answer the question yes." Counsel for the defendant on the answer remarked: "Sort of parenthetical question as it were." Objection was made to this remark and the court said: "That is objectionable." No exception was saved to the ruling. The witness was asked: "May I ask you, during the nineteen years of school, did you have as much trouble understanding questions that were asked you by your scholars as you are understanding questions I have asked you yesterday and today?" Objection was made and sustained to this question and the court requested counsel "to please confine yourself to the issues in the case." No exception was saved. The witness was asked about the meaning of the term "superheat" when applied to steam and the court without objection remarked that he thought the question was confusing. No objection or exception was made to the remark of the court. Counsel asked the witness: "Now, the only place that you know of or the most common place where superheaters are used, in railroad locomotives and steam turbines?" Thereupon, the court said: "May I ask at this time what is the purpose now?" The purpose was stated and the court remarked: "Let's devote our time to that and not to the question of superheating water." No exception was taken. There is nothing in this record to show that counsel for defendant was in any way unreasonably restricted in cross-examination or that defendant was prejudiced by the conduct of the court.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

It is not necessary to go into detail about the motion for rehearing in the instant case. We refer to and adopt, as applicable here, what is said on the motion for rehearing in the companion case of Vitale v. Duerbeck, 338 Mo. 556, 96 S. W. (2d) 691, which opinion on the motion for rehearing in the companion case is handed down concurrently with the filing of this memorandum. The motion for rehearing should be overruled, and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing memorandum is adopted by the court.