CHARLES TRAMILL, RESPONDENT, v. BEN PRATER, APPELLANT.—152 S. W. (2d) 684.

Kansas City Court of Appeals.   May 5, 1941.

Rehearing Denied June 16, 1941.

*Crouch & Crouch, William M. Kimberlin, Mitchel J. Henderson, Thos. E. Deacy, Herbert Jacob, Henderson, Deacy, Henderson & Swofford* for appellant.

*Clay C. Rogers, Meyer & Smith* and *Will H. Hargus* for respondent.

760

SHAIN, P. J.—In this action the plaintiff seeks damages for injuries alleged as received by reason of negligence of defendant.

The first two paragraphs of plaintiff's petition state as follows:

"For his cause of action against defendant, plaintiff, states that on or about the third day of June, 1939, an agent, servant and employee of the defendant, while on and about the business of the defendant, carelessly and negligently caused, suffered and permitted a truck of the defendant, being operated by and in the exclusive possession and control of the defendant's said agent and employee, to collide with plaintiff on a public street and thoroughfare in the City of Harrisonville, Missouri, and that as a direct result thereof plaintiff sustained the injuries hereinafter set out.

"Plaintiff further states that while he was upon and attempting to cross said street the driver of said truck saw, or, by the exercise of the highest degree of care, could have seen that the plaintiff, who was oblivious to said truck's approach, was in a position of imminent peril of said truck colliding with plaintiff and the plaintiff being injured thereby, in time for said driver, thereafter, by the exercise of the highest degree of care, and with the means at hand, and with safety to the said truck and the driver thereof, and to other persons and property on said street, to have averted and prevented plaintiff's injury by stopping said truck or slackening the speed thereof, or swerving the same to one side, or sounding a warning, but said driver of said truck negligently failed to do so and thereby proximately caused plaintiff's said injuries."

Thereafter the plaintiff sets forth the nature and extent of the injuries. However, as no question of excessive verdict is presented we need not set forth as to same.

Defendant filed answer as follows:

"Comes now defendant in the above entitled cause and for his answer to the petition of plaintiff filed herein denies each and every allegation in said petition contained.

"Wherefore, having fully answered, defendant prays to be discharged with his costs.

"Defendant, for further answer, states that if plaintiff was injured at the time and place mentioned in the petition, that said injuries, if any, were directly and solely caused by the negligence and

carelessness of the plaintiff in walking into the rear end of the truck of defendant.

"Wherefore having fully answered, defendant asks to be discharged with his costs."

Trial was had by jury and the jury found for plaintiff and assessed his damages at $5000. Judgment was in accordance with jury verdict and defendant has duly appealed.

We will continue to refer to respondent as plaintiff and to appellant as defendant.

The defendant makes seven assignments of error with supporting reasons and references to the record. However, defendant presents his case under five points wherein citation of authorities appears.

Defendant's points are as follows:

"I

"The Court erred in refusing to give Instruction B, in the nature of a demurrer to the evidence offered by defendant at the close of the case, because in the light of physical laws and facts of common knowledge, plaintiff could not have been oblivious of the approach of defendant's truck and therefore did not make a submissible case for the jury.

"II

"The Court erred in giving plaintiff's Instruction No. 1 because under the physical laws and facts of common knowledge, plaintiff could not have been oblivious to the approach, or in a position of the peril of defendant's truck and, therefore, this instruction does not conform to the evidence.

"III

"The Court erred in refusing to give defendant's Instruction I, which was submitted by defendant.

"IV ·

"The Court erred in refusing to sustain the objection of counsel for defendant to the remarks of plaintiff's counsel in his opening statement to the jury to the effect that Mr. Sweet, representative of the Western Automobile Insurance Company, was called by Mr. Crouch and Dr. Scott after the accident and took charge of the case, and erred in denying defendant's motion to discharge the jury thereafter.

"V

The Court erred in permitting counsel for plaintiff, over the objection of the defendant, to inquire from the witness J. U. Scott as to his conversation with, and payment by, Mr. Sweet of the Western Casualty Company, and erred in refusing thereafter to discharge the jury, as requested by the defendant."

It appears that on the day plaintiff came in contact with defendant's truck, he was in the town of Harrisonville purchasing supplies. After

762

having made several calls at stores he was going north on the east side of South Independence Street and started to cross over to the west side of said street.

The following questions and answers in plaintiff's testimony gives plaintiff's version of what occurred, to-wit:

"Q. Then what did you do? A. I was going across the street, going to cross to go to the Western Automobile Store.

"Q. Going across South Independence Street? A. Yes, sir.

"Q. Did you turn and start across there? A. Yes, I turned and started to walk across.

"Q. Was there any automobiles on the east side of Independence at that time? A. Yes, sir.

"Q. How many did you notice? A. Two.

"Q. And about how far apart were they parked? A. Eight or ten feet.

"Q. There was eight or ten feet clear space between them? A. Yes, sir.

"Q. What is the fact as to whether or not you walked between those two automobiles parked on the east side of the street there? A. Walked—

"Q. Did you pass between these automobiles? A. Yes, sir.

"Q. Now when you got to the curb and before you got into the street tell the jury whether or not you looked up and down the street? A. I did.

"Q. Could you see both ways along the street? A. I could.

"Q. When you looked to the south tell the jury whether or not there was any truck in sight? A. Not when I looked south.

"Q. Where were you standing when you first looked south? A. I was standing right at the edge of the curb.

"Q. Then what did you do? A. I walked out on past those cars.

"Q. Did you look south any more? A. Yes, sir.

"Q. Where were you when you next looked south? A. I was just past those cars when I looked south.

"Q. Did you look as far south as Mechanic? A. Yes, sir.

"Q. Tell the jury whether or not there was an automobile truck come off Mechanic into Independence at that time? A. There wasn't any truck in sight when I looked.

"Q. And you say you did look? A. I did look.

"Q. Did you look to the north? A. Yes, sir, I did.

"Q. Did you see any southbound automobile north of you? A. I did.

"Q. And about where, about how many feet north of you did you see that automobile? A. Well, something around 100 feet or a little over.

"Q. And when you saw that what did you do? A. I stopped a few seconds for it to go by.

"Q. And about how far were you out in the street from these parked automobiles when you stopped for this automobile to go by? A. About two steps.

"Q. About how many feet? A. About five feet.

"Q. And is that where you stopped and stood waiting for this automobile to go past? A. Yes, sir.

"Q. Do you have any idea how long you were there? A. Just a few seconds.

"Q. About how fast was it traveling? A. Going south?

"Q. Yes. A. I should judge about 15 miles per hour.

"Q. Did you wait until it went past you? A. I did.

"Q. Then what did you do? A. I looked then to see if there was anything coming from the south.

"Q. And what did you see then? A. I seen a truck.

"Q. How near was this truck of Mr. Prater's to you at that time? A. Six or seven or eight feet.

"Q. Six or seven or eight feet? A. Yes, sir.

"Q. And tell the jury what direction it was then going with respect to coming towards you? A. It was traveling north.

"Q. And about where in relation to where you were standing, where were you standing in relation to the front and of the truck? A. I was almost in the middle of it.

"Q. In the middle of what? A. Almost in the middle of the bumper part.

"Q. Almost in the middle of the bumper? A. Yes, sir.

"Q. You mean the front end? A. Yes, sir.

"Q. When you saw this truck within six or seven or eight feet coming directly towards you, what did you do? A. I tried to get back out of the way of it.

"Q. Where did you try to get? A. I tried to get back, jumped back.

"Q. And when you say you jumped back what do you mean? A. Towards the curb.

"Q. To the east? A. Yes, sir.

"Q. Back in the direction in which you had came? A. Yes, sir.

"Q. Were you able to get entirely out of the way of the truck? A. No, sir.

"Q. Did the truck strike you? A. Some part of the body did.

"Q. Some part of the body did? A. Yes, sir.

"Q. Did some part of the body strike you as you were jumping trying to get out of the way? A. Yes, sir.

"Q. Did you walk into the side of that truck? A. I did not.

"Q. Did you walk into the back end or side of that truck? A. I did not.

"Q. Did you know that truck was approaching until it appeared in six or seven feet of you? A. I did not.

"Q. Was any horn sounded to warn you of the approach of the truck, that it was approaching the place where you were standing? A. There was not.

"Q. Then what happened after the truck struck you? A. I don't know what happened after the truck struck me."

Mr. W. E. Wollard was called as a witness for plaintiff. The following questions and answers appear in his testimony:

"Q. Now after he left the curb and walked west between these cars tell the jury what he did? A. He stepped right off the side walk—

"Q. He stepped where? A. Right off the side walk.

"Q. I mean after he walked from between the two cars? A. Well, possibly he stepped one or two steps into the street—

"Q. Then what did he do? A. Well he stopped and looked north, and there was a car coming from the north and a truck from the south.

"Q. At that time how far south was the truck? A. 15 or 20 feet, something like that.

"Q. About how fast was it going? A. 8 or 10 miles per hour.

"Q. Did the truck ever sound a horn? A. I don't think so, that was all I heard.

"Q. Did he ever swerve? A. He might have swerved a little to the right, to the east.

"Q. He swerved to the east? A. Yes, sir.

"Q. Do you know what part of the truck struck Mr. Tramill? A. Well, from the middle to the back end, I couldn't see for that car as I was going down the steps, as I went down those five steps the car hid my view."

It is shown that the defendant was driving a truck with a dump body that extended out beyond the side of the cab about eight or ten inches and about six or eight inches beyond the rear wheels.

The defendant offered testimony that contradicted the testimony of plaintiff and Wollard that plaintiff had reached a position in the street beyond the parked cars and was standing when hit.

Dr. E. H. Owen, who was driving his car in the same direction with the truck and was about fifty feet behind the truck when the contact occurred, was called as a witness by the defense. The doctor estimated the speed of the truck at from twelve to fifteen miles per hour and that it was running out about four feet from the parked cars.

The following questions and answers appear in the direct examination of Dr. Owen:

"Q. Did you see Mr. Tramill just immediately before this accident? A. Well, he was coming out from between the cars when I saw him.

"Q. Now, what cars do you mean? A. The two parked cars on the east side of the street. He was coming from between those cars.

"Q. Were there two parked cars on the east side of the street? A. Yes.

"Q. Where was the first you saw Mr. Tramill? A. The first I saw him he was walking out between those two cars.

"Q. And where was the truck then with relation to him—to Mr. Tramill? A. The body of the truck you mean?

"Q. Yes; where was the truck with relation to him? A. I don't know how to answer that. He struck the back portion of the truck. I think the main part of the truck had probably already passed him, the engine part, the cab part of the truck.

"Q. When you first observed Mr. Tramill, what did you observe about him, his action; what he did? A. He was just in motion and appeared to be looking down.

"Q. From the time that he came out into view did he ever stop— Mr. Tramill ever stop? Well, did you observe Mr. Tramill come out? A. I saw him walk out from between the two cars.

"Q. Did he stop? A. He didn't until he hit the truck.

"Q. Doctor, did you observe Mr. Tramill from the time he came into view until he was struck? A. Well, I think I can say that I did, because he walked out from between these two cars and was struck by the truck. It happened rather quickly, but I thought I was going to have to slow down quite a bit, I know, if I didn't hit him myself, because he was walking right out in front of me."

Mr. Charles Staley, the driver of the truck was called as a witness for defendant. In his testimony, the following questions and answers appear:

"Q. Now where was Mr. Tramill when you saw him, or did you see him? A. He was on the curb when I saw him.

"Q. Where with relation to these parked cars we have been talking about? A. He was right in amongst them.

"Q. What did you see him do? A. Well, I watched him until he stepped off the curb.

"Q. Did you see him do anything else then? A. He stopped then.

"Q. What direction was he facing? A. Southwest, towards me.

"Q. How far back were you from him at that time? A. I was about 30 feet.

"Q. How far was he from the curb when you saw him stop facing your direction? A. About three feet."

Thereafter the following is shown:

"Q. And did you see Mr. Tramill after you saw him step out there with his head facing towards you? A. No, sir.

"Q. Did you tell me how far you were back from him at that time, how far south of him you were? A. I was somewhere near 30 feet.

"Q. Something like 30 feet? A. Yes, sir.

"Q. And where was the car to the north, if you remember, the car coming from the north? A. It was about in front of Davis Brothers, something near that I imagine.

"Q. Mr. Staley, what was the first thing that you knew there had been an accident? A. I heard a commotion on the truck.

"Q. What did you do? A. I looked around to see if this car had hooked one of the hind wheels of my truck.

"Q. That car that was passing? A. Yes, sir.

"Q. What did you do then? A. I stopped.

"Q. And did you go back? A. Yes, sir."

In the cross-examination of Mr. Staley, the following appears:

"Q. You never did see Mr. Tramill after you got within about 30 feet of where he was standing, did you? A. I took my eyes off him, yes, sir.

"Q. Where did you put your eyes after you took them off of him? A. He was right in my line of vision there.

"Q. I thought you said you took your eyes off of him? A. I never paid no more attention after I got that close and after he stopped.

"Q. At that time he was about three or four feet east of the west side of these cars, was he? A. About the middle of the cars.

"Q. About the middle of the cars? A. Yes, sir.

"Q. And at that time you were going about eight miles per hour? A. Yes, sir.

"Q. Now, I refer again to your deposition which you gave last Friday, on page 6 thereof: I want to ask you if you remember these questions and these answers: 'Q. Was there any time from the time you first saw this approaching car that you did not see it up to the time of collision? A. No, I guess not. Q. You then continued to watch it at all times? A. Well, yes.' You gave those answers, did you not? A. Yes.

"Q. And the very next question: 'Q. Did you have any particular reason for watching it? A. No, I never had no particular reason for watching it.' You gave that answer, did you not? A. Yes, sir."

Defendant's contention on point one is stated as follows:

"It is defendant's contention on this appeal that the testimony of plaintiff is so contrary to the physical laws and facts of common knowledge that it cannot be believed and must be disregarded."

There is a map in the record showing South Independence Street from East Mechanic Street north and wherein the points and places referred to in evidence are shown.

The defendant makes calculations based upon the southbound car going at 15 miles per hour, 22 feet per second, and the northbound truck going at 8 miles per hour 11.73 feet per second, and from premises assumed draws conclusions as follows:

"Therefore, it would follow that in that interim of time of 8.2 seconds that plaintiff was watching the southbound car, the defendant's truck traveled a total of 96.18 feet. 96 feet plus the six or eight feet that plaintiff states the truck was to his south when he first saw it puts the truck south of plaintiff one hundred two feet, or twenty-three feet from the north line of Mechanic Street. This would be out in front of the Safeway Store and clearly within plaintiff's view when he looked to the south."

The plaintiff in his brief and with reference to the map and testimony, makes calculations that are materially different from those made by defendant.

The plaintiff is entitled to the most favorable inference that can be drawn from all the evidence in the case. From an examination of the record, we find that plaintiff testifies that when he first saw the southbound automobile it was travelling at about five miles per hour. However, he testifies when he saw it 100 feet away its speed was 15 miles per hour. Other testimony is to the effect that the southbound car was going along slowly and another estimated it was from 10 to 12 miles. The estimates in evidence as to the speed of the approaching northbound truck varied from 4 or 5 to 10 or 12 or 15 miles per hour.

In our review of this case, we take cognizance of the fact that the estimates as to speed are shown to be more or less based upon the opinion of each witness.

Based upon estimated speeds that appear in the record, the plaintiff in answer to defendant's conclusion, *supra,* states:

"We accept appellant's formula that an automobile travels 1.46 feet per mile of speed per second. On this basis, we have these results:

"At 15 miles per hour, a car would travel 22 feet per second, or 200 feet in 9 seconds.

"At 10 miles per hour, it would travel 14⅔ feet per second, or 200 feet in 13 to 14 seconds.

"At 5 miles per hour, it would travel 7 1/3 feet per second, or 200 feet in 27 seconds.

"In other words, from 9 to 27 seconds would have elapsed between the time plaintiff looked south as he entered the street and saw no truck and th time the truck was 6 or 8 feet from him."

The defendant cites authority on the well established rule as to consideration of testimony contrary to physical laws and facts. The rule is salutary but its application must be with caution and courts must not indulge in arbitrary deductions. The latest utterance of the Supreme Court on the question is found in Murphy v. Wolferman, an opinion by the Supreme Court, 148 S. W. (2d) 481, wherein it is said:

"A 'court may properly reject evidence which is contrary to the physical facts or to known physical laws, or which is the result of

evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity.' [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079, loc. cit. 1082. See also Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S. W. (2d) 1075, loc. cit. 1079, and cases there cited.] But 'It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment by reasonable minds, of any other.' [Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, loc. cit. 1074; Bloecher v. Buerbeck, 338 Mo. 535, 92 S. W. (2d) 681, loc. cit. 685; Schupback v. Nesevsky (Mo.), 300 S. W. 465, loc. cit. 467.]''

We rule against defendant on his point one.

Defendant's point two presents again the question of physical laws and facts as directed to the question of obliviousness. Plaintiff's testimony is to the effect that he was oblivious to the approach of the truck and the testimony of Dr. Owen that the defendant came out ''just in motion'' and appeared to be looking down, tends to show obliviousness. We rule against defendant on his point two.

Defendant's point three is based upon claim of error in refusing an instruction. The instruction when read and analyzed presents the occurrence as a mere casualty within the legal meaning of an accident. The evidence in the case at bar clearly shows the cause of the casualty. Dr. Owen, who was coming to the rear of the truck testifies that he saw the defendant in a position that he would be in danger from forward movement of his car. It is somewhat remarkable that of those who were in a position to see what happened, the driver of the truck is the one shown to have not have been an eye witness of what happened. Further, after the happening, his first thought was of collision, with the southbound car. In In re Walker v. Klein, 127 S. W. (2d) l. c. 55, the St. Louis Court of Appeals comments as follows:

''Our Supreme Court has held that an essential requirement to bring a casualty within the legal meaning of the term 'accident' is that the happening be one to which human fault does not contribute; and that, where the misadventure results from the known actions of known persons and things, the giving of an instruction on the theory of accident is reversible error. [Kaley v. Huntley, 333 Mo. 771, 63 S. W. (2d) 21.]''

The defendant asked and received a sole cause instruction submitting its theory of defendant walking into the rear of the truck and thereby being the sole cause of his injury. We rule against defendant on his point three.

Defendant's point four arises out of matters said by plaintiff's counsel in his opening statement.

In examining the jury panel preparatory to selection, inquiry was made by plaintiff's attorney touching acquaintance and relation to doctors.

One question asked was as follows:

"Mr. Rogers: Now, gentlemen, are any of you acquainted with Dr. George Norberg or Dr. Teachnor, who was employed by someone interested in representing the defendant in this case—are you acquainted with either of those doctors?"

We gather that the questions asked were occasioned by matters that took place before the court and not in the presence of the jury. The counsel for defendant informed the court that defendant Prater had $10,000 indemnity insurance, whereupon plaintiff asked to amend by making claim for damages $20,000 instead of $10,000. Objection was made to amendment and amendment was not made.

In the discussion before the court, the record shows as follows:

"Mr. Rogers: Let me understand you, Mr. Crouch. Maybe we can come to an agreement. As I understand you you say Mr. Prater has $10,000 insurance?

"Mr. Crouch: That is right.

"Mr. Rogers: And it is your contention that this is the first time that Mr. Prater has been brought into this case, is that what you mean?

"Mr. Crouch: He is entitled to be present and have his attorney here.

"Mr. Rogers: Up until this time he hasn't had anything to do with the defense of this case?

"Mr. Crouch: He has had insurance.

"Mr. Rogers: And the insurance company has had full control of the defense?

"Mr. Crouch: Yes, sir.

"Mr. Rogers: He hasn't had anything to do with that?

"Mr. Crouch: Not since he notified the company.

"Mr. Rogers: You don't represent him?

"Mr. Crouch: No, sir, I do not. I represent him in another case, but not in this case, excepting as representing the liability of the insurance company."

The remarks objected to and objection by counsel and ruling of court and exceptions taken appear in the record as follows:

"Mr. Rogers: So that my position may be clear to the Court may I state it? I expect to say to the jury that the reason why we do not intend to use Dr. Norberg and Dr. Teachnor is because they are not doctors selected by Mr. Tramill and in no sense his physicians and they are in fact not responsible to him for the facts are that while Mr. Tramill was unconscious and after he had been taken to Dr.

Scott's office Mr. Crouch called Dr. Scott and Dr. Scott told him the man had a fractured skull and Mr. Crouch told him to put him in an ambulance and take him to a hospital in Kansas City and then Mr. Crouch called Mr. Sweet, then a representative of the Western Casualty Insurance Company and turned the situation over to him and he said he would take care of that and that was done.

"Mr. Crouch: We object to that for the reason it is improper and attempting to inject immaterial and irrelevant matter into this record and attempting to prejudice the jury and if that is the rule a person couldn't do any humanitarian act when a man was unconscious without having it paraded before the jury to create an inference.

"Mr. Rogers: I don't offer it on the ground of any admission. I am merely offering it to show why we don't produce these men who are not under our control.

"The Court: I think you can go that far.

"Mr. Crouch: In order that I can make my record will it now be understood that I am making my objection to this statement and that it is overruled and that I note my exceptions and ask that the Court discharge the jury for the prejudicial statement?"

Substantially the above statement was made to the jury in the opening statement.

The plaintiff called on J. A. Scott as a witness. In direct examination the following questions and answers appear:

"Q. Did anybody communicate with you that day and tell you what to do with him? A. Yes, sir.

"Q. Who did that? A. Judge Crouch. It was several hours after he was hurt, I don't remember how long, but it was the same day.

"Q. What did he tell you to do with him? A. He told me the insurance company wanted to know the full extent of his injuries and he told me to get him in a car and take him to the hospital and an investigation by X-ray and he gave me the name of a person to leave with the hospital officials to communicate with for future treatment.

"Q. What was that name? A. Mr. Sweet.

"Q. What did he say the name of the company was? A. I don't remember now.

"Q. Was it the Western Casualty Company? A. It might have been.

"Mr. Crouch: In view of the testimony just elicited by counsel for the plaintiff, we having heretofore objected to this line of testimony and having been overruled, we again renew our objection and ask that the jury be discharged.

"The Court: Refused.

"Mr. Crouch: For the further reason that the man was unconscious and needed immediate treatment, and under any theory of humanitarian principles whatever, it was proper they should give

him attention and this is now done here for.the sole purpose of prejudicing this jury against the defendant.

"THE COURT: Overruled.

"To which ruling of the Court the defendant excepted and still excepts."

There is other evidence in the record of similar purport as that shown and referred to in review as to points four and five. However, we conclude the above suffices to an understanding of the aforesaid points.

Dr. Norberg and Dr. Teachnor referred to, *supra,* were not called by either plaintiff or defendant.

While the attorney for the defendant made statement before the court as to insurance, to the end of examination of jurors, and while argument as to plaintiff's mention of amending petition by reason of insurance also brought out said fact, still the attorney was never used as a witness. This fact together with the fact that no reference was made by any of defendant's witnesses concerning insurance leads us to conclude, and we do so conclude, that those cases wherein is involved the question of insurance is brought into the case in the examination of witnesses by way of impeachment have no application to the issue as same is presented in the case at bar. Further, there is no showing in the record herein that can justify bringing such fact to the jury as rebuttal to any evidence offered by defendant.

In an opinion by the Supreme Court of Missouri, Grindstaff v. Goldenberg & Sons Structural Steel Co., 40 S. W. (2d) 702, there is found language that, if taken from its context, appears to uphold the conduct of plaintiff in bringing into the case the matter of insurance The said language is as follows:

"Throughout the trial the utmost effort was exerted by plaintiff to show, and by defendant to conceal, the fact, if a fact, that a liability insurance company was making the defense. It seems only necessary to say, if an insurance company is the real defendant and as such is resisting plaintiff's action and conducting a defense of its own contriving, it should be compelled to put aside its disguise and stand in the open. Both the court and the jury have a right to know who are the real parties litigant; questions relating to the admissibility of evidence, the weight to be given testimony, and the credibility of witnesses are involved. [Snyder v. Wagner Elec. Mfg. Co., 284 Mo. 285, 223 S. W. 911; Jablonowski v. Modern Cap. Mfg. Co., 312 Mo. 173, 279 S. W. 89; Schuler v. Can Co., 322 Mo. 765, 18 S. W. (2d) 42.] On the other hand, if the steel company is the defendant in reality as well as in name and as such is conducting its own defense, then the fact, if a fact, that it is protected from loss on account of the casualty involved by liability or indemnity insurance, is wholly irrelevant to the issues, and may be highly prejudicial if brought to the attention of the jury."

From an examination of the above opinion, it is disclosed that the case was determined against the plaintiff on the express grounds that the plaintiff had failed to make a submissible case. It follows that the language quoted above is not necessary to, nor does it aid in any manner the conclusion reached. Further, an examination of the case discloses that the language used was directed to an entirely different situation than is presented in the case at bar in that the fact of insurance was lawfully brought to the knowledge of the jury by way of impeachment of witness offered by plaintiff. The fact of insurance was brought into the case at bar in the regular course following inquiry as to whether jurymen were interested in, or employees of, insurance companies. We conclude that injection of "insurance" as shown in the case at bar, is error.

There are many later opinions by the Supreme Court from which we conclude that the course followed by plaintiff in the case at bar is erroneous.

In the case of Rytersky v. O'Brine, 70 S. W. (2d) 538, after reviewing many authorities in this State dealing with the question of the injection of insurance in the trial of damage suits, the court said:

"Let us repeat that when a plaintiff has been afforded his privilege on the *voir dire* examination to make an honest inquiry of the jurors as to their relation to any person directly or indirectly interested in the case as an insurer or otherwise, so as to enable him to select impartial, disinterested, and altogether fit jurors to try the case, then the question of liability insurance goes out of the case, as in fact it never was in it, so far as the trial of the case is concerned. The purpose of permitting this *voir dire* examination is that the jurors may impart relevant information to the attorneys in order to aid them in selecting an impartial jury, and not to afford the attorneys an opportunity to impart to the jurors prejudicial information to be kept in mind and acted on by them in arriving at a verdict. No attorney should seek or be allowed to convert his privilege of obtaining information in order to select an impartial jury into a means of planting prejudicial facts in the minds of jurors so as to render them biased and prejudiced."

In the case of Hannah v. Butts, 330 Mo. 876, 51 S. W. (2d) 4, our Supreme Court was passing on a situation somewhat similar to the facts in the present case. Controversy arose when in the opening statement in behalf of the plaintiff certain things were detailed concerning the Mr. Morgan who was agent of the insurance company and what he said and did. The court in passing on the propriety of that statement being made in the beginning of the case, said:

"There was, therefore, not the slightest excuse or justification for mentioning insurance or an insurance company in the presence or hearing of the jury after it was impaneled, unless and until Morgan was put on the witness stand by the defendant; and that was never

done. That the persistent attack on an invisible insurance company was highly prejudicial to defendant cannot be doubted. [Grindstaff v. Steel Company (Mo.), 40 S. W. (2d) 702, 706.]''

In the case of Olian v. Olian, 332 Mo. 689, 50 S. W. (2d) 673, our Supreme Court in passing on evidence of statements made by the defendant that he was at fault and carried liability insurance, reversed the case because of the prejudicial error injecting the amount of insurance and said this in connection with that subject:

''. . . It is the common experience of practicing attorneys that it is highly prejudicial to a defendant's case for the jury to be informed that any verdict returned against the defendant will not hurt him, but will be paid by an insurance company. Attorneys trying damage suits for plaintiffs know well the advantage to be gained by getting such fact before the jury, and are only too prone to seek such advantage.

''In the present case plaintiff was accorded the right to question the jurors on the *voir dire* examination as to any connections with the Union Indemnity Company of New Orleans. No such connection was shown, and no juror was disqualified. There was seemingly no reason for mentioning the question of insurance or the name of any insurance company. However, no complaint is now made as to plaintiff having been given the right to make this preliminary examination. Plaintiff was not, however, content with having indicated in this indirect way that an insurance company was interested in the defense of this case and might have to pay whatever damages were assessed, but plaintiff pursued the matter further in the course of the trial.''

''The court and counsel should, however, keep in mind that the introduction of such highly prejudicial evidence is a serious and hazardous matter and is to be avoided rather than sought for. The plaintiff should take care not to introduce such prejudicial evidence unless there is a reasonable necessity for so doing. He should never try his case on the theory that, if he can in some way get the jury to understand that an insurance company will ultimately have to pay the damages assessed, he is sure to win his case and get a big verdict.''

We rule with defendant on his points four and five. Judgment reversed and cause remanded. All concur.